IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION


STEVE HERRING,
      Petitioner,

vs.                                Case No. 4:08cv111/SPM/EMT

STEVEN SINGER,
      Respondent.
_____/

## REPORT AND RECOMMENDATION

This cause is before the court on Petitioner's amended petition for writ of habeas corpus filed under 28 U.S.C. § 2254 (Doc. 4). Respondent filed an answer and relevant portions of the state court record (*see* Docs. 16, 25). Petitioner filed a reply (Doc. 30).

The matter is referred to the undersigned magistrate judge for report and recommendation pursuant to 28 U.S.C. § 636 and N. D. Fla. Loc. R. 72.2(b). After careful consideration of all issues raised by Petitioner, it is the opinion of the undersigned that no evidentiary hearing is required for the disposition of this matter, Rules Governing Section 2254 Cases 8(a). It is further the opinion of the undersigned that the pleadings and attachments before the court show that Petitioner is not entitled to relief.

I.      BACKGROUND AND PROCEDURAL HISTORY

The relevant aspects of the procedural background of this case are established by the state court record (*see* Doc. 16, Exhibits).[1] Petitioner was charged in the Circuit Court for Leon County, Florida, with one count of sexual battery involving serious physical force likely to cause serious injury, one count of kidnapping to facilitate a felony, and one count of sexual battery upon a child

---

[1] Hereinafter all citations to the state court record refer to the exhibits submitted with Respondent's original answer (Doc. 16).

twelve years of age or older but under eighteen years of age by a familial or custodial authority (Ex. A at 2). The victim in this case was Petitioner's daughter. Following a jury trial, he was convicted as charged on all counts (Ex. A at 70–71; Ex. B at 276–77). Petitioner was adjudicated guilty on April 27, 2004, and sentenced to life imprisonment on Counts 1 and 2, and thirty (30) years of imprisonment on Count 3 (Ex. A at 79–88, Ex. I ). Petitioner, through counsel, appealed the judgment of conviction and sentence to the Florida First District Court of Appeal ("First DCA") (Ex. M). On August 12, 2005, the First DCA affirmed the judgment of conviction per curiam without written opinion, with the mandate issuing August 30, 2005 (Exs. O, P). Herring v. State, 908 So. 2d 1060 (Fla. 1st DCA 2005) (Table). Petitioner did not seek further review by the Florida Supreme Court or the United States Supreme Court.

On May 17, 2006, Petitioner filed a motion to correct illegal sentence, pursuant to Rule 3.800(a) of the Florida Rules of Criminal Procedure, in the trial court (Ex. Q at 23–32). On May 4, 2007, the trial court denied the motion (*id.* at 223–25).

On July 14, 2006, Petitioner filed a motion for post-conviction relief, pursuant to Rule 3.850 of the Florida Rules of Criminal Procedure, in the trial court (*id.* at 40–136). On May 8, 2007, the trial court denied the motion without an evidentiary hearing (*id.* at 236–43). Petitioner appealed the decision to the First DCA. The appellate court affirmed per curiam without written opinion on December 21, 2007, with the mandate issuing February 19, 2008 (Exs. R, S, T). Herring v. State, 973 So. 2d 1128 (Fla. 1st DCA 2007) (Table).

On May 23, 2007, Petitioner filed a petition alleging ineffective assistance of appellate counsel in the First DCA (Ex. U). The court denied the petition on October 31, 2007 (Ex. X). Herring v. State, 968 So. 2d 560 (Fla. 1st DCA 2007) (Table).

Petitioner filed the instant habeas action on March 6, 2008 (Doc. 1 at 1). Respondent concedes that the petition is timely (Doc. 25 at 11).

## II. STANDARD OF REVIEW

Section 2254(a) of Title 28 provides that "a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court" upon a showing that his custody is in violation of the Constitution or laws of the United States. As the instant petition was filed after April 24, 1996, it is subject to the more deferential standard for

habeas review of state court decisions under § 2254 as brought about by the Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA). Pub.L. 104-132, § 104, 110 Stat. 1214, 1218-19. In relevant part, section 2254(d) now provides:

> (d)  An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
>
>> (1)  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>>
>> (2)  resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C.A. § 2254 (2002).

The United States Supreme Court explained the framework for § 2254 review in Williams v. Taylor, 529 U.S. 362, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000).[2]  The appropriate test was described by Justice O'Connor as follows:

> In sum, § 2254(d)(1) places a new constraint on the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court.  Under § 2254(d)(1), the writ may issue only if one of the following two conditions is satisfied—the state court adjudication resulted in a decision that (1) "was contrary to . . . clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "involved an unreasonable application of . . . clearly established Federal law, as determined by the Supreme Court of the United States."  Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts.  Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

---

[2] Unless otherwise noted, references to Williams are to the majority holding, written by Justice Stevens for the Court (joined by Justices O'Connor, Kennedy, Souter, Ginsburg, and Breyer) in parts I, III, and IV of the opinion (529 U.S. at 367–75, 390–99); and Justice O'Connor for the Court (joined by Justices Rehnquist, Kennedy, Thomas, and—except as to the footnote—Scalia) in part II (529 U.S. at 403–13).  The opinion of Justice Stevens in Part II was joined by Justices Souter, Ginsburg, and Breyer.

*Id.*, 529 U.S. at 412–13 (O'Connor, J., concurring); Ramdass v. Angelone, 530 U.S. 156, 120 S. Ct. 2113, 2119–20, 147 L. Ed. 2d 125 (2000).  In employing this test, the Supreme Court has instructed that on any issue raised in a federal habeas petition upon which there has been an adjudication on the merits in a formal State court proceeding, the federal court should first ascertain the "clearly established Federal law," namely, "the governing legal principle or principles set forth by the Supreme Court at the time the state court render[ed] its decision."  Lockyer v. Andrade, 538 U.S. 63, 71–72, 123 S. Ct. 1166, 155 L. Ed. 2d 144 (2003).  The law is "clearly established" if Supreme Court precedent at the time "would have compelled a particular result in the case."  Neelley v. Nagle, 138 F.3d 917, 923 (11th Cir. 1998), *overruled on other grounds by* Parker v. Head, 244 F.3d 813, 835 (11th Cir. 2001).

Next, the court must determine whether the State court adjudication is contrary to the clearly established Supreme Court case law, either because "'the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases' or because 'the state court confronts a set of facts that are materially indistinguishable from a decision of th[e] [Supreme] Court and nevertheless arrives at a result different from [Supreme Court] precedent.'"  Lockyer, 538 U.S. at 73 (quoting Williams, 529 U.S. at 405–06).  The Supreme Court has clarified that "[a]voiding these pitfalls does not require citation to our cases—indeed, it does not even require awareness of our cases, so long as neither the reasoning nor the result of the state-court decision contradicts them."  Early v. Packer, 537 U.S. 3, 8, 123 S. Ct. 362, 365, 154 L. Ed. 2d 263 (2002) (quoting Williams, 529 U.S. at 405–06).  If the State court decision is found in either respect to be contrary, the district court must independently consider the merits of the petitioner's claim.

If on the other hand, the State court applied the correct Supreme Court precedent and the facts of the Supreme Court cases and the petitioner's case are not materially indistinguishable, the court must go to the third step and determine whether the State court "unreasonably applied" the governing legal principles set forth in the Supreme Court's cases.  The standard for an unreasonable application inquiry is "whether the state court's application of clearly established federal law was objectively unreasonable."  Williams, 529 U.S. at 409.  Whether a State court's decision was an unreasonable application of legal principle must be assessed in light of the record the court had before it.  Holland v. Jackson, 542 U.S. 649, 652, 124 S. Ct. 2736, 2737–38, 159 L. Ed. 2d 683

(2004) (per curiam); *cf.* Bell v. Cone, 535 U.S. 685, 697 n.4, 122 S. Ct. 1843, 1851 n.4, 152 L. Ed. 2d 914 (2002) (declining to consider evidence not presented to state court in determining whether its decision was contrary to federal law). An objectively unreasonable application of federal law occurs when the State court "identifies the correct legal rule from Supreme Court case law but unreasonably applies that rule to the facts of the petitioner's case" or "unreasonably extends, or unreasonably declines to extend, a legal principle from Supreme Court case law to a new context." Putman v. Head, 268 F.3d 1223, 1241 (11th Cir. 2001). The State court's incorrect or erroneous application of clearly established law will be held to be reasonable and not warrant a writ so long as the State court adjudication results in a "satisfactory conclusion." Williams, 529 U.S. at 410–12.

Section 2254(d) also allows federal habeas relief for a claim adjudicated on the merits in State court where that adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). The Supreme Court has clarified that: "a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." Miller-El v. Cockrell, 537 U.S. 322, 340, 123 S. Ct. 1029, 1041, 154 L. Ed. 2d 931 (2003) (dictum).

When performing its review under § 2254(d), the federal court must bear in mind that any "determination of a factual issue made by a State court shall be presumed to be correct," and the petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *see e.g.* Miller-El, 537 U.S. at 340 (explaining that a federal court can disagree with a state court's factual finding and, when guided by AEDPA, "conclude the decision was unreasonable or that the factual premise was incorrect by clear and convincing evidence"); Jones v. Walker, 469 F.3d 1216, 1226–27 (11th Cir. 2007) (holding that § 2254(d)(2)'s "unreasonable determination" standard "must be met by clear and convincing evidence," and concluding that that standard was satisfied where prisoner showed "clearly and convincingly" that the state court's decision "contain[ed] an 'unreasonable determination' of fact.").

Only if the federal habeas court finds that the petitioner satisfied AEDPA, and § 2254(d), does the court take the final step of conducting an independent review of the merits of the petitioner's claims. *See* Panetti v. Quarterman, 531 U.S. 930, 953, 127 S. Ct. 2842, 2858, 168 L.

Ed. 2d 662 (2007); <u>Jones</u>, 469 F.3d 1216 (same). The writ will not issue unless the petitioner shows that he is in custody "in violation of the Constitution or laws and treaties of the United States." 28 U.S.C. § 2254(a).

III.    EXHAUSTION AND DEFAULT

It is a long-standing prerequisite to the filing of a federal habeas corpus petition that the petitioner have exhausted available state court remedies, 28 U.S.C. § 2254(b)(1),[3] thereby giving the State the "'opportunity to pass upon and correct' alleged violations of its prisoners' federal rights." <u>Duncan v. Henry</u>, 513 U.S. 364, 365, 115 S. Ct. 887, 888, 130 L. Ed. 2d 865 (1995) (quoting <u>Picard v. Connor</u>, 404 U.S. 270, 275, 92 S. Ct. 509, 30 L. Ed. 2d 438 (1971) (citation omitted)). To satisfy the exhaustion requirement, the petitioner must "fairly present" his claim in each appropriate state court, alerting that court to the federal nature of the claim. <u>Duncan</u>, 513 U.S. at 365–66; <u>O'Sullivan v. Boerckel</u>, 526 U.S. 838, 845, 119 S. Ct. 1728, 144 L. Ed. 2d 1 (1999); <u>Picard</u>, 404 U.S. at 277–78.

The Supreme Court has offered the following guidance for determining whether a habeas petitioner has met the "fair presentation" requirement. In <u>Picard v. Connor</u>, the Court held that, for purposes of exhausting state remedies, a claim for relief in habeas corpus must include reference to a specific federal constitutional guarantee, as well as a statement of the facts which entitle the petitioner to relief. 404 U.S. at 277. In announcing that "the substance of a federal habeas corpus claim must first be presented to the state courts," <u>id.</u>, 404 U.S. at 278, the Court rejected the contention that the petitioner satisfied the exhaustion requirement by presenting the state courts only with the facts necessary to state a claim for relief.

---

[3]Section 2254 provides, in pertinent part:

(b)(1)    An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that–
      (A)  the applicant has exhausted the remedies available in the courts of the State; or
      (B) (i)  there is an absence of available State corrective process; or
         (ii)  circumstances exist that render such process ineffective to protect the rights of the applicant.
. . . .
(c) An applicant shall not be deemed to have exhausted the remedies available in the courts of the State, within the meaning of this section, if he has the right under the law of the State to raise, by any available procedure, the question presented.

Additionally, the Court has indicated that it is insufficient to make a general appeal to a constitutional guarantee as broad as due process to present the "substance" of such a claim to a state court. In <u>Anderson v. Harless</u>, 459 U.S. 4, 103 S. Ct. 276, 74 L. Ed. 2d 3 (1982), the habeas petitioner was granted relief on the ground that a jury instruction violated due process because it obviated the requirement that the prosecutor prove all the elements of the crime beyond a reasonable doubt. *Id.* 459 U.S. at 7 (citing <u>Sandstrom v. Montana</u>, 442 U.S. 510, 99 S. Ct. 2450, 61 L. Ed. 2d 39 (1979)). The only manner in which the habeas petitioner cited federal authority was by referring to a state court decision in which "the defendant . . . asserted a broad federal due process right to jury instructions that properly explain state law." <u>Anderson</u>, 459 U.S. at 7 (internal quotation marks omitted). The Court expressed doubt that a defendant's citation to a state-court decision predicated solely on state law was sufficient to fairly apprise a reviewing court of a potential federal claim merely because the defendant in the <u>cited</u> case advanced a federal claim. *Id.*, 459 U.S. at 7 and n.3. Furthermore, the Court clarified that such a citation was obviously insufficient when the record satisfied the federal habeas court that the federal claim asserted in the cited case was not the same as the federal claim on which federal habeas relief was sought. *Id.*

Years later, the Supreme Court readdressed the "fair presentation" requirement in <u>Duncan v. Henry</u>, 513 U.S. 364. The <u>Duncan</u> Court strictly construed the exhaustion requirement so as to mandate that, if state and federal constitutional law overlap in their applicability to a petitioner's claim, the petitioner must raise his issue in terms of the applicable federal right in state court in order to obtain federal review of the issue.[4] The Supreme Court explained, "[i]f a habeas petitioner wishes to claim that an evidentiary ruling at a state court trial denied him the due process of law guaranteed by the Fourteenth Amendment, he must say so, not only in federal, but in state court." <u>Duncan</u>, 513 U.S. at 365–66. Recently, the Supreme Court again focused upon the requirement of "fair presentation," holding that "ordinarily a state prisoner does not 'fairly present' a claim to a state court if that court must read beyond a petition or a brief (or a similar document) that does not alert it to the presence of a federal claim in order to find material, such as a lower court opinion in the

---

[4] The petitioner in <u>Duncan</u> raised a federal due process claim in his habeas petition, but had raised only a state constitutional claim in his state appeal. Presented with a state constitutional claim, the state court applied state law in resolving the appeal.

case, that does so." <u>Baldwin v. Reese</u>, 541 U.S. 27, 124 S. Ct. 1347, 1351, 158 L. Ed. 2d 64 (2004).

The <u>Baldwin</u> Court commented that "[a] litigant wishing to raise a federal issue can easily indicate the federal law basis for his claim in a state-court petition or brief, for example, by citing in conjunction with the claim the federal source of law on which he relies or a case deciding such a claim on federal grounds, or by simply labeling the claim 'federal.'" <u>Id.</u>, 541 U.S. at 32. With regard to this statement, the Eleventh Circuit stated in <u>McNair v. Campbell</u>, 416 F.3d 1291 (11th Cir. 2005):

> If read in a vacuum, this dicta might be thought to create a low floor indeed for petitioners seeking to establish exhaustion. However, we agree with the district court that this language must be "applied with common sense and in light of the purpose underlying the exhaustion requirement[:] 'to afford the state courts a meaningful opportunity to consider allegations of legal error without interference from the federal judiciary.'" <u>McNair</u> [v. Campbell], 315 F. Supp. 2d at 1184 (quoting <u>Vasquez v. Hillery</u>, 474 U.S. 254, 257, 106 S. Ct. 617, 620, 88 L. Ed. 2d 598 (1986)). This is consistent with settled law established by the Supreme Court. . . . We therefore hold that "'[t]he exhaustion doctrine requires a habeas applicant to do more than scatter some makeshift needles in the haystack of the state court record.'"

416 F.3d at 1302-03 (citations omitted).[5]

An issue that was not properly presented to the state court and which can no longer be litigated under state procedural rules is considered procedurally defaulted, that is, procedurally barred from federal review. <u>Bailey v. Nagle</u>, 172 F.3d 1299, 1302–03 (11th Cir. 1999). This court will also consider a claim procedurally defaulted if it was presented in state court and rejected on the independent and adequate state ground of procedural bar or default. <u>See</u> <u>Coleman v. Thompson</u>, 501 U.S. 722, 734–35 and n.1, 111 S. Ct. 2546, 2555 and n.1, 115 L. Ed. 2d 640 (1991); <u>Caniff v. Moore</u>, 269 F.3d 1245, 1247 (11th Cir. 2001) ("[C]laims that have been held to be procedurally defaulted under state law cannot be addressed by federal courts."); <u>Chambers v. Thompson</u>, 150 F.3d 1324, 1326–27 (11th Cir. 1998) (applicable state procedural bar should be enforced by federal court

---

[5] In his initial brief before the Court of Criminal Appeals, the petitioner cited one federal case in a string citation containing other state cases, and in a closing paragraph in his argument that extraneous materials were considered by the jury during deliberations, stated that there was a violation of his rights "protected by the Fifth, Sixth, Eighth[,] and Fourteenth Amendments to the United States Constitution, the Alabama Constitution[,] and Alabama law." <u>McNair v. Campbell</u>, 416 F.3d 1291, 1303 (11th Cir. 2005). The court found that these references to federal law were not sufficient to meet the fair presentment requirement and noted that it was important that the petitioner had never mentioned the federal standards regarding extraneous materials in his brief, but relied on state law for his arguments. <u>Id.</u>

even as to a claim which has never been presented to a state court); *accord* Tower v. Phillips, 7 F.3d 206, 210 (11th Cir. 1993); Parker v. Dugger, 876 F.2d 1470 (11th Cir. 1990), *rev'd on other grounds*, 498 U.S. 308, 111 S. Ct. 731, 112 L. Ed. 2d 812 (1991). In the first instance, the federal court must determine whether any future attempt to exhaust state remedies would be futile under the state's procedural default doctrine. Bailey, 172 F.3d at 1303. In the second instance, a federal court must determine whether the last state court rendering judgment clearly and expressly stated its judgment rested on a procedural bar. *Id.*. A federal court is not required to honor a state's procedural default ruling unless that ruling rests on adequate state grounds independent of the federal question. *See* Harris v. Reed, 489 U.S. 255, 109 S. Ct. 1038, 1043, 103 L. Ed. 2d 308 (1989). The adequacy of a state procedural bar to the assertion of a federal question is itself a federal question. Lee v. Kemna, 534 U.S. 362, 122 S. Ct. 877, 885, 151 L. Ed. 2d 820 (2002). The Eleventh Circuit has set forth a three-part test to determine whether a state court's procedural ruling constitutes an independent and adequate state rule of decision. Judd v. Haley, 250 F.3d 1308, 1313 (11th Cir. 2001). First, the last state court rendering judgment must clearly and expressly state it is relying on state procedural rules to resolve the federal claim.[6] Second, the state court's decision on the procedural issue must rest entirely on state law grounds and not be intertwined with an interpretation of federal law. Third, the state procedural rule must be adequate. *Id.* The adequacy requirement has been interpreted to mean the rule must be firmly established and regularly followed, that is, not applied in an arbitrary or unprecedented fashion. *Id.*

To overcome a procedural default, the petitioner must show cause and prejudice or a fundamental miscarriage of justice in order for the federal habeas court to reach the merits of a claim. Tower, 7 F.3d at 210; Parker, 876 F.2d 1470. "For cause to exist, an external impediment, whether it be governmental interference or the reasonable unavailability of the factual basis for the claim, must have prevented petitioner from raising the claim." McCleskey v. Zant, 499 U.S. 467, 497, 111 S. Ct. 1454, 1472, 113 L. Ed. 2d 517 (1991) (quoting Murray v. Carrier, 477 U.S. 478, 488, 106 S. Ct. 2639, 2645, 91 L. Ed. 2d 397 (1986)). Lack of counsel or ignorance of available

---

[6] The federal court should honor the procedural bar even if the state court alternatively reviewed the claim on the merits. Marek v. Singletary, 62 F.3d 1295, 1302 (11th Cir. 1995); Alderman v. Zant, 22 F.3d 1541 (11th Cir. 1994).

procedures is not enough to establish cause. <u>Tower</u>, 7 F.3d at 210. To satisfy the miscarriage of justice exception, the petitioner must show that "a constitutional violation has probably resulted in the conviction of one who is actually innocent." <u>Schlup v. Delo</u>, 513 U.S. 298, 327, 115 S. Ct. 85, 130 L. Ed. 2d 808 (1995). "To establish the requisite probability, the petitioner must show that it is more likely than not that no reasonable juror would have convicted him." <u>Schlup</u>, 513 U.S. at 327. Further:

> a substantial claim that constitutional error has caused the conviction of an innocent person is extremely rare. To be credible, such a claim requires [a] petitioner to support his allegations of constitutional error with new reliable evidence -- whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence -- that was not presented at trial.

*Id.*

Within this framework, the court will review Petitioner's claims.

## IV. PETITIONER'S CLAIMS

A. <u>Ground One: "Petitioner was denied the assistance of counsel during his jury trial."</u>

In Ground One, Petitioner contends the trial court failed to conduct a sufficient <u>Faretta</u>[7] inquiry to determine whether he knowingly and voluntarily waived his right to assistance of counsel before permitting him to proceed pro se (Doc. 4 at 5).[8] Petitioner states he raised this ground in his Rule 3.850 motion as a "Denial of Counsel" claim (*id.*).

Respondent contends Petitioner failed to exhaust this claim in the state courts (Doc. 25 at 13–14). Respondent argues Petitioner raised a "Denial of Counsel" claim as Ground One of his Rule 3.850 motion; however, he did not raise the issue of the trial court's failure to conduct a sufficient <u>Faretta</u> inquiry. Instead, Petitioner argued only that the trial court erred by denying his request for assistance of counsel at trial and failing to appoint counsel during the ten-day window for filing a motion for new trial (Ex. Q at 78–79, 106–11). Respondent further contends the procedurally proper vehicle for raising the instant claim in the state courts would have been in Petitioner's direct appeal of his conviction; therefore, even if Petitioner raised the claim in his post-conviction motion, it

---

[7] <u>Faretta v. California</u>, 422 U.S. 806, 95 S. Ct. 2525, 45 L. Ed. 2d 562 (1975).

[8] The page references used in this Report reflect the page numbers as enumerated in the court's electronic docketing system rather than those the parties may have assigned.

would have been procedurally barred (Doc. 25 at 14). Respondent additionally contends even if Petitioner properly raised the claim in the state court, the claim is without merit because the trial court conducted a thorough <u>Faretta</u> inquiry at a hearing on December 18, 2003 (Doc. 25 at 14–16).

In Petitioner's reply, he argues the issue he is asserting is the same issue he raised as Ground One in his Rule 3.850 motion, that is, he was totally denied counsel during his jury trial (Doc. 30 at 2). Petitioner concedes that he did not mention <u>Faretta</u> in his Rule 3.850 motion, but he argues the <u>Faretta</u> issue was "subsumed" in the issues raised in Ground One of his Rule 3.850 motion (*id.* at 3). Petitioner argues this court must address the <u>Faretta</u> issue "in combination with the other arguments raised in the state court motion," and if the court determines that the trial court failed to conduct a proper <u>Faretta</u> inquiry, then he is entitled to federal habeas relief (*id.*). Petitioner additionally argues that even if he did not raise the <u>Faretta</u> issue in the state courts, the claim is "technically" exhausted because there is no longer an available state court remedy by which he may raise the issue in the state courts (*id.* at 4).

Upon review of the state court record, the undersigned concludes that Petitioner did not fairly present the instant claim to the state courts. In Ground One of his Rule 3.850 motion, Petitioner argued the trial court violated his right to counsel guaranteed by the Fifth, Sixth, and Fourteenth Amendments by denying his request for counsel at trial and failing to appoint counsel during the ten-day window for filing a motion for new trial (*see* Ex. Q at 78–79, 106–11). He argued the total deprivation of counsel during trial constituted a structural defect in the proceedings and required automatic reversal of his conviction (*id.*). He argued further that the right to counsel extended to all critical stages of the proceedings, including the period for filing a motion for new trial (*id.*). Petitioner did <u>not</u> argue that the trial court failed to conduct a sufficient inquiry to determine whether his waiver of counsel was knowing and voluntary (*id.*). Therefore, Petitioner did not exhaust this claim in the state courts.[9]

---

[9] Moreover, Petitioner did not fairly present the instant claim on direct appeal of his conviction. On direct appeal, Petitioner argued only that the trial court failed to make a sufficient inquiry of Petitioner and defense counsel, as required by <u>Nelson v. State</u>, 274 So. 2d 256 (Fla. 4th DCA 1973), regarding Petitioner's allegations of ineffective representation before denying Petitioner's request to discharge counsel (Ex. M). This was not the same issue raised by Petitioner either in his Rule 3.850 motion or in the instant amended § 2254 petition.

Notwithstanding Petitioner's failure to exhaust the instant claim, the claim is without merit.[10] In <u>Faretta</u>, the Supreme Court reiterated the well-founded principle that in order for an accused to represent himself, he must "knowingly and intelligently" forgo the benefits associated with the right to counsel which he relinquishes when he manages his own defense. 422 U.S. at 835 (internal quotation marks omitted). The court continued, "Although a defendant need not himself have the skill and experience of a lawyer in order competently and intelligently to choose self-representation, he should be made aware of the dangers and disadvantages of self-representation, so that the record will establish that he knows what he is doing and his choice is made with eyes open." *Id.* (internal quotation marks omitted). The Court determined that Faretta knowingly and voluntarily waived his right to counsel where, weeks before trial, (1) Faretta clearly and unequivocally declared to the trial judge that he wanted to represent himself and did not want counsel; (2) the record affirmatively showed that Faretta was literate, competent, and understanding, and that he was voluntarily exercising his informed free will; and (3) the trial judge had warned Faretta that he thought it was a mistake not to accept the assistance of counsel, and that Faretta would be required to follow all the "ground rules" of trial procedure. *Id.* at 835–36. The Court held that in light of Faretta's knowing and voluntary waiver of his right to counsel and his declared wish to conduct his own defense, the trial court violated his constitutional right to proceed without counsel by forcing a lawyer upon him. *Id.*

Even when a defendant does not affirmatively request to represent himself, he may voluntarily waive his right to counsel through his conduct. Fairly recently, the Eleventh Circuit issued two *en banc* decisions concerning waivers of the right to counsel, <u>United States v. Garey</u>, 540 F.3d 1253 (11th Cir. 2008) (en banc) and <u>Jones v. Walker</u>, 540 F.3d 1277 (11th Cir. 2008) (en banc), *cert. denied*, — U.S. —, 129 S. Ct. 1670, 173 L. Ed. 2d 1039 (2009). Both cases involved similar factual scenarios where a criminal defendant sought to discharge competent, appointed counsel on the eve of trial, was given the choice of proceeding either with appointed counsel or pro se, and was

---

[10] An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State. 28 U.S.C. § 2254(b)(2).

found to have voluntarily and knowingly waived counsel by refusing to proceed with appointed counsel.

In United States v. Garey, a federal criminal defendant claimed on direct appeal that the district court violated his Sixth Amendment right to counsel by requiring him to represent himself at trial. 540 F.3d at 1257. The defendant moved to dismiss his appointed counsel (Scott Huggins) three days before trial based upon an alleged conflict of interest. *Id.* at 1258–59. After determining no conflict existed, the district court informed Garey it would not appoint a new lawyer for him and he must choose between proceeding with Attorney Huggins or pro se. *Id.* at 1258–60. The district court advised Garey of the sentence he faced, explained the disadvantages of self-representation, and advised him to proceed with Huggins as counsel. *Id.* at 1259–60, 1269–70. Garey insisted he would not allow Attorney Huggins to represent him, but stated he was not voluntarily waiving his right to counsel and never affirmatively chose self-representation. *Id.* at 1261–63, 1269–70. The trial court interpreted Garey's uncooperative behavior as a voluntary and knowing waiver of his right to counsel. *Id.* at 1260–61. Garey ultimately represented himself at trial, with Huggins remaining as standby counsel. *Id.* at 1262–63. The jury found Garey guilty, and the court sentenced him. *Id.*

On appeal, Garey contended the district court violated his Sixth Amendment right to counsel by requiring him to represent himself when he had not made an affirmative request to do so. *Id.* A divided panel of the Eleventh Circuit agreed and reversed Garey's conviction. *See* United States v. Garey, 483 F.3d 1159 (11th Cir. 2007). The Eleventh Circuit granted en banc review and affirmed Garey's convictions. The *en banc* court stated it is well-established that a defendant may waive his right to counsel when he does so voluntarily and knowingly, but the means by which he may do so are less clear. Garey, 540 F.3d at 1262–63. The court noted that Faretta "recognized the right to self-representation in the context of deciding whether a defendant who had asked to represent himself and had demonstrated a rudimentary knowledge of legal procedure was entitled to proceed pro se." *Id.* However, "Faretta's discussion of the right to self-representation presupposed a cooperative defendant willing to engage in reciprocal dialogue with the court," and "[t]he Supreme Court has never confronted a case in which an uncooperative defendant has refused to accept appointed counsel or engage in a colloquy with the court." *Id.* at 1263 (emphasis added). Thus, the Supreme Court had never been asked to determine the issue presented in Garey of "whether a

defendant may waive counsel without making an explicit, unqualified request to represent himself." *Id.*  The *en banc* court explained that the problem with treating the express, affirmative request for self-representation discussed in <u>Faretta</u> as the exclusive means by which a defendant may waive the right to counsel is that "it forces judges to ignore words, actions, and circumstances relevant to the Sixth Amendment inquiry," such as when a defendant makes "repeated, unequivocal statements rejecting his lawyer even though he knew the court would not appoint another lawyer to represent him." *Id.* at 1265.  Thus, the <u>Garey</u> court concluded "it is possible for a valid waiver of counsel to occur not only when a cooperative defendant affirmatively invokes his right to self-representation, but also when an uncooperative defendant rejects the only counsel to which he is constitutionally entitled, understanding his only alternative is self-representation with its many attendant dangers." *Id.*  The Eleventh Circuit further stated "when an indigent defendant rejects competent, conflict-free counsel, he may waive his right to counsel by his uncooperative conduct, so long as his decision is made with knowledge of his options and the consequences of his choice." *Id.* at 1266.  Turning to <u>Garey</u>'s case, the court concluded that "[b]y rejecting appointed counsel, Garey voluntarily chose to proceed pro se as surely as if he had made an affirmative request to do so" and that "Garey voluntarily waived his right to counsel by his conduct."  *Id.* at 1269 (emphasis added).

In addition to being voluntary, the <u>Garey</u> court explained a waiver of counsel also must be knowing.  *Id.*  The <u>Garey</u> court cited Supreme Court precedent establishing that a waiver of the right to counsel must be a knowing act done with sufficient awareness of the relevant circumstances; and whether a waiver was knowingly made depends upon the particular facts and circumstances of the case, including the background, experience, and conduct of the accused.  *Id.* at 1265–66.  The Eleventh Circuit recognized that <u>Faretta</u> established that before a court concludes a defendant has knowingly waived his right to counsel, the court should attempt to engage the defendant in a full discussion of the dangers of self-representation.  *Id.* at 1267 (citing <u>Faretta</u>, 422 U.S. at 835).  But when a defendant is not willing to engage in such a dialogue, the district court may discharge counsel so long as it is assured that the defendant understands the choices before him and knows the potential dangers of proceeding pro se. *Id.*  The Eleventh Circuit concluded that Garey's waiver was knowing because the district court explained to Garey, "clearly and repeatedly, what his

constitutional choices were and what dangers lay along the path of self-representation;" and the record showed Garey understood his choices. *Id.*

The case of Jones v. Walker, presented a similar Sixth Amendment waiver-of-counsel issue, but in the procedural posture of a state prisoner seeking habeas corpus relief through § 2254. 540 F.3d 1277. The defendant Jones was unsatisfied with his appointed counsel (Claudia Saari) and moved to dismiss her as counsel nearly two months before trial. *Id.* at 1279–80. The state trial court denied the motion. *Id.* At a hearing two weeks before trial, Jones continued to express his dissatisfaction with counsel Saari. *See id.* at 1280–82. The state trial court stated Saari was a fine, experienced lawyer, and Jones would either proceed with Saari as counsel or represent himself. *Id.* at 1280–81. Jones insisted he was not waiving his right to counsel, but he did not want to proceed with Saari or pro se. *Id.* After the dialogue continued in this manner, the trial court discharged Saari as Jones's counsel and continued the trial date. *Id.* at 1281–82.

Before trial, Jones informed the trial court he had reconciled with Saari and wanted her to represent him. *Id.* The trial court reappointed Saari as Jones's counsel and continued the trial. *Id.* As the trial date approached, Jones again complained about Saari's representation. *Id.* The trial court held another hearing and presented Jones with the options of proceeding pro se or with Saari as counsel. *Id.* at 1282–83. Jones insisted he did not want Saari, but was not waiving his right to counsel or choosing to proceed pro se. *Id.* The trial court eventually discharged Saari as Jones's counsel. *Id.* Jones represented himself at trial; the jury convicted him; and the trial court sentenced him to life imprisonment. *Id.* at 1282–84.

On direct appeal, the Georgia Supreme Court affirmed Jones's convictions based, in part, on a finding that Saari "'testified that she made Jones fully aware of the nature of the charge, the possible sentences, and the dangers of self-representation.'" *Id.* at 1287 (quoting Jones v. State, 272 Ga. 884, 536 S.E.2d 511, 513 (2000)). The state courts denied Jones's requests for post-conviction relief. *Id.*

The district court denied Jones's § 2254 petition. *Id.* However, a panel of the Eleventh Circuit concluded Jones's Sixth Amendment rights were violated because he had not clearly and unequivocally asserted his desire to waive counsel and proceed pro se. Jones v. Walker, 496 F.3d 1216 (11th Cir. 2007). The Eleventh Circuit granted *en banc* review. The *en banc* Jones court,

relying on Garey, concluded Jones could not show the state court decision was contrary to, or an unreasonable application of, federal law, as required by § 2254(d)(1), "because the Supreme Court has never confronted a Sixth Amendment challenge involving a defendant who rejects his appointed counsel without good cause." Jones, 540 F.3d at 1288. However, the court concluded Jones had satisfied § 2254(d)(2) by showing the Georgia Supreme Court's decision on direct appeal unreasonably determined the facts, because the record demonstrated Jones's counsel Saari never testified about whether she warned Jones of the dangers of self-representation. *Id.* at 1288–89 & n. 5. Thus, the Eleventh Circuit reviewed the case de novo without deferring to the state court's decision. *Id.*

After discussing Garey, the Eleventh Circuit concluded Jones's conduct was "even less cooperative and more dilatory" than Garey's. *Id.* at 1269–70. Jones understood he was entitled to one attorney, Saari, but he rejected Saari's assistance and said he did not want her to represent him. *Id.* The Court concluded the state court did not err in determining Jones "voluntarily chose to proceed pro se as surely as if he had made an affirmative request to do so, and therefore voluntarily waived his right to counsel by his conduct." *Id.* (internal quotation marks omitted).

The issue of whether Jones knowingly waived his right to counsel diverged from Garey because neither the trial court nor counsel warned Jones on the record about the dangers and disadvantages of proceeding pro se. *Id.* at 1270. But unlike the defendant's direct appeal in Garey, defendant Jones was petitioning for habeas corpus relief and bore the burden of proving by a preponderance of the evidence his waiver of counsel was not knowingly made. *Id.* at 1270. "To meet his burden, Jones was required to point to evidence in the record from which a trier of fact could reasonably conclude Jones did not understand the dangers of self-representation at the time he waived his right to counsel." *Id.*

The Jones court concluded Jones had failed to meet this burden. *Id.* First, the *en banc* court rejected the suggestion that the lack of on-the-record warnings of the dangers and disadvantages of self-representation was dispositive of whether Jones's waiver was knowingly made. *See id.* Based on prior precedent, the Eleventh Circuit stated that a lack of on-the-record warnings by the trial court is not conclusive proof that a defendant's waiver of counsel was unknowingly made and does not always lead to reversal. *Id.* Trial court warnings "are a means to the end of ensuring defendants do

not waive fundamental constitutional rights without an adequate understanding of the consequences of their choices." *Id.* However, the "ultimate test of whether a defendant's choice is knowing is not the adequacy of the trial court's warning but the defendant's understanding." *Id.* at 1293 (internal quotation marks omitted). "So long as a defendant knows the risks associated with self-representation, it is irrelevant for constitutional purposes whether his understanding comes from a colloquy with the trial court, a conversation with his counsel, or his own research or experience." *Id.* at 1293.

Thus, because counsel Saari never testified she warned Jones (as the Georgia courts found), the Eleventh Circuit, using de novo review, scrutinized the record to determine whether it supported a finding that Jones knowingly waived his right to counsel. *Id.* at 1293–96. In doing so, the court examined a variety of factors, such as the defendant's background, experience, and conduct; his knowledge of the nature of the charges, the possible defenses, and the possible penalties; and whether the defendant was trying to manipulate the events of the trial. *Id.*

Several factors suggested Jones's waiver was not knowingly made, such as: (1) his age (twenty-one years old at the time of his indictment); (2) his minimal experience with the criminal justice system (one prior conviction based on a plea); (3) his lack of prior trial experience; (4) the lack of standby counsel; and (5) the lack of on-the-record warnings of the dangers of self-representation. *Id.* at 1295–96. Nevertheless, several factors suggested Jones's waiver was knowingly made, such as: (1) he was not mentally ill; (2) he understood the nature of the charges against him; (3) he was aware of the possible penalties he faced upon conviction; (4) he had the opportunity to consult with experienced trial counsel; and (5) he understood courtroom rules and procedures well enough to participate actively in his defense at trial by moving to suppress evidence, making objections, moving for a judgment of acquittal, and examining and cross-examining witnesses. *Id.* Furthermore, the Eleventh Circuit pointed out that Jones missed his best opportunity to develop the record when, at the motion for a new trial hearing, he failed to testify whether he knew from Saari or any other source the dangers of self-representation. *Id.* In light of the record evidence supporting the inference that Jones's waiver was knowing and "the dearth of evidence pointing to the opposite conclusion," the Eleventh Circuit concluded Jones had not met his burden of proving his waiver of counsel was not knowing. *Id.* at 1295–96.

With <u>Garey</u> and <u>Jones</u> as background, the undersigned turns to the instant case. Early in the proceedings, Petitioner filed several pro se motions, including a motion to proceed pro se and a pro se demand for speedy trial, indicating he "understands his right to proceed as pro se, and [knows] that the State can not refuse this request" (Ex. A at 12, 13, 19). A hearing on Petitioner's motions was held on December 18, 2003 (Ex. B). At the hearing, Petitioner represented to the court that it was a "difficult decision" whether to hire a lawyer due to financial considerations (Ex. B at 3). The following colloquy ensued:

> THE COURT: So, are you requesting that I appoint the Public Defender at this time?
>
> [PETITIONER]: I filed motions to proceed pro se.
>
> THE COURT: Well, I understand that. I'm just—what I'm hearing you say is that you have a different—I guess I misconstrued your comments.
>
> [PETITIONER]: If I may clarify what I'm trying to say, Your Honor. If competent attorney was represented (sic.) I would welcome that. I understand that these are very serious charges against me. And I've had public defenders represent me in the past, and it's my feeling that I didn't get very good representation. That's my feeling toward public defenders.
>
> THE COURT: So, you wish to represent yourself?
>
> [PETITIONER]: At this point.

(Ex. B at 3–4). The trial court then examined Petitioner's financial situation and determined that he could afford to hire a lawyer; but the court informed him that it would reconsider this determination if Petitioner's "situation changes" (*id.* at 4–9). The court strongly advised Petitioner against proceeding pro se, explaining in detail many of the advantages of representation by counsel and the disadvantages of proceeding pro se:

> THE COURT: . . . well, let me interrupt you for just a second. There's another place where a lawyer would be likely to advise you. They would be very likely to advise you not to say anything on the record here about the facts of the case. Because everything you say here can be used against you at trial. You know, and that's one of the situations of somebody representing themselves is [sic] at a distinct disadvantage.

A lawyer can get up and represent things to me about the facts of the case and they're not necessarily an admission against you. But as soon as you tell me something, the State can order a transcript of this proceeding. They can present that information at trial against you. And, you know, I'm sure you wouldn't view it as a confession, but they could well be things that would be used as admissions against you. So, you know, you're at a real disadvantage, you know, doing this on your [own].

You know, a lawyer could have an opportunity to, you know, first decide what the situation is as to your bond situation, and check into that, and understand the law in that. And then they're going to be in a position to be able to do, you know, discovery and investigate your case. They also would be able to better advise you. I know you have made a demand for speedy trial, but that may well not be in your best interest. And an attorney could do that, and an attorney may well be able to gather favorable evidence that would assist you at trial.

But with, you know, you representing yourself, you're not going to have that opportunity. But, you know, again, that's up to you. I just want to make sure you understand I'm not going to treat you special just because you're, you know, representing yourself. And, you know, you're going to be limited in the legal resources that you have, based on being in custody. I mean, I'm not going to try to order the Sheriff's Department to, you know, give you special treatment. You know, a lawyer would be able to go out and research freely and have access to that, and make sure the rules were being complied with. You're also going to, you know—you're going to—as I'm sure you know, I run a pretty tight ship in the courtroom. And you're not going to be able to be disruptive of that. And you'll have to abide by the rules as I say it. You're also going to be limited in your ability to talk with the State Attorney's Office, and negotiate your case. It may be that an attorney involved in the case—I mean, you don't know how the State would be willing to resolve this case, and you're going to be pretty limited.

(*id.* at 11–12).

The court afforded Petitioner an opportunity to discuss his choices with an assistant public defender who was present at the hearing, explaining to Petitioner that his demand for speedy trial would dictate the matter to some extent because the case had to move forward (*id.* at 14–15). The court further explained that Petitioner could, if a determination of indigency was made, request appointment of counsel so a public defender could do "preliminary work" and then discharge counsel later if he decided he would rather represent himself, provided that Petitioner satisfied the court's inquiry (*id.* at 16–17). However, the court would likely not grant a request for new counsel simply on the ground that Petitioner did not like his existing appointed counsel (*id.* at 17).

After a recess, during which Petitioner spoke with an assistant public defender, the court determined that Petitioner financially qualified for appointment of counsel, but Petitioner stated he wished to represent himself (*id.* at 18–20). The court advised Petitioner that if he desired an attorney, he would appoint one to represent him at the State's expense (*id.* at 21). Petitioner stated he understood that, but he did not want the court to appoint an attorney "at this time" (*id.* at 22). The following discussion between the court and Petitioner ensued:

> THE COURT: Well, I mean, probably now is the critical time, either to appoint you one or not. I mean, that doesn't mean you can't raise it with me again, and we will—it would be—now would be the critical time for you to have an attorney representing you. It would make a lot more sense for you to get an attorney to represent you now and then decide to discharge them after they've looked into the case than the other way around. To, you know, mess around with the case on your own, and then at the last minute want to try to bring an attorney in, that would be, you know, the backwards way to do it.
>
> Do you want me to appoint you a lawyer or not?
>
> THE DEFENDANT: Yes, sir.
>
> THE COURT: And I don't mean to be trying to twist your arm. I'm trying to make sure you understand that probably, to represent yourself, you know, at least initially, is probably a foolish thing to do on your part. And that's why—you know, and I've said, down the road, you think you've got it figured out, and you want to proceed on your own, and the attorney's not willing to move fast enough to suit, [sic] you just need to make me aware of that and we will revisit the issue. But anyway, I say that because I didn't want you to feel like I'm forcing you to do something one way or the other, but at the same time I want to be honest with you and tell you, you know, what the disadvantages are. What do you want to do?
>
> THE DEFENDANT: I know I just said I want an attorney, but I think I will go forward, Your Honor, and represent myself at this time.
>
> THE COURT: Okay. Well, we're going to need to—I have gone through it with you, but there is some inquiry that I need to make. And most of these things I have already, you know, explained to you some of the advantages of having an attorney. Did you understand what I said in terms of the advantages to have an attorney?
>
> THE DEFENDANT: Yes, sir.
>
> THE COURT: Do you have any question about that?

page 21 of 55

THE DEFENDANT:  No, sir.

THE COURT:  All right.  And I also went through some of the dangers and disadvantages to you of representing yourself.  Did you understand what I said to you on those items?

THE DEFENDANT:  Yes, sir.

THE COURT:  And did you have any question about that?

THE DEFENDANT:  No, I don't

THE COURT:  And did you have an opportunity to talk with Ms. Flury [an assistant public defender] during the break?  We have been in break for about an hour and a half, I guess.  Did you have an opportunity to discuss with her the advantages and disadvantages as I discussed them?

THE DEFENDANT:  Your Honor, at this time, no, I haven't waived lawyer and attorney's privilege (sic.).  I would prefer not to comment one way or the other on what we discussed.

THE COURT:  Well, I'm going to require you to tell me, did you discuss with her the advantages and disadvantages of representing yourself, or not?
. . . .

THE DEFENDANT:  Yes, we did have that opportunity.

THE COURT:  Okay.  Do you understand Ms. Ray [the prosecutor] is not going to go easier on you because you're representing yourself?

THE DEFENDANT:  Yes, sir.
. . . .

THE COURT:  You understand, Mr. Herring, there is a no contact order, and based on that, you're not going to be able to have any contact with the alleged victim in this case.  You know, the advantage to an attorney is they would be able to have that kind of contact.  Do you understand that?

THE DEFENDANT:  Yes, sir.
. . . .

THE COURT:  So, it's just one of the disadvantages that you're going to have to deal with.  You're not going to be able to talk to or interview this victim in this case, which is a decided disadvantage in a case of this sort.  Normally an attorney would be able to depose her.  And because of the legal situation, you're not going to be able to do that.  So you need to understand that that's a distinct disadvantage to you.

THE DEFENDANT: Yes, sir.

THE COURT: And you understand that if you're convicted you're not going to be able to claim on appeal that, you know, you lack legal knowledge or skill, that you didn't have an effective attorney, because you have decided to represent yourself? Do you understand that?

THE DEFENDANT: I'm not sure about the appeal law, sir.

THE COURT: Well, I'm telling you. On an appeal, if you were convicted, you're not going to be able to say that you didn't—because of your situation as a nonlawyer, you were deprived of the right to an attorney. Because I have offered you the right to an attorney, you have declined it. And so, on appeal, you're not going to be heard to complain of the representation that you got. You are representing yourself. Do you understand that?

THE DEFENDANT: I think I understand what you're saying, Your Honor.

THE COURT: Well, it's pretty clear. And, you know, most defendants have a right to claim, if they didn't get effective representation, that their attorney didn't do a good job for them. That's a claim that most defendants can make. If you're going to represent yourself, you're not going to be able to make that claim, because you made a decision to represent yourself. Do you understand that?

THE DEFENDANT: I believe I do, sir.

THE COURT: Do you understand that—do you have any questions about the dangers or disadvantages of representing yourself as I have outlined them for you here today?

THE DEFENDANT: No.

(*id.* at 22–27). The assistant public defender advised the court that she told Petitioner that the prosecutor informed her that she had filed a notice of intent to use "Williams Rule" evidence; and she (the assistant public defender) explained to Petitioner that such evidence presented a difficult issue (*id.* at 30).

The court provided a copy of the charging document to Petitioner and asked him to review it (*id.* at 29). Petitioner read the amended information and stated he understood the charges (*id.* at 30). The court then advised Petitioner that Count 1, sexual battery involving serious physical force, carried a maximum life sentence; Count 2, kidnapping, also carried a maximum life sentence; and

Count 3, sexual battery by familial authority, carried a maximum of 30 years of imprisonment (*id.*). The court also advised Petitioner of the possibility of sentence enhancements if a weapon was involved, and that other sentencing provisions may increase his sentence, such as habitual offender status (*id.* at 30–31).

The court then conducted an inquiry to determine Petitioner's competency to waive counsel and represent himself. The court ascertained that Petitioner was forty-one (41) years old; he could read and write English; he had no difficulty understanding English; he received a GED and obtained some community college education; he was never diagnosed with or treated for any mental illness; he was not under the influence of any drugs or alcohol; and he did not have any physical problem that would hinder his self-representation (*id.* at 32–33). Petitioner acknowledged that he had not been threatened by anyone to refuse legal representation, and he understood that he would not have to pay for representation (*id.* at 33). Petitioner stated he had previously represented himself in post-conviction proceedings, but he was not successful (*id.* at 33–34). Petitioner asked the court whether he was barred from hiring a lawyer, and the court responded:

> THE COURT: Absolutely not. Don't misconstrue my comments at all. That wasn't what I intended. . . . At any point in time that you want to hire a lawyer, or that you wish to reassert your right to request me to appoint a lawyer, you just need to make me aware of that, and we will do—we will bring it back and do that.
>
> The only thing you can't do is wait until the last minute before a trial and then think you can walk in at the last minute, and, by getting the appointment of an attorney or asking an attorney to come in, that I'm automatically going to continue the case. It's not going to work that way.
>
> THE DEFENDANT: May I ask a question, a source of concern in that statement, sir? Could you more define the last minute, or would you be willing to give me some idea of your idea of the last minute?
>
> THE COURT: It's difficult for me to answer that. It just all depends on the circumstances. You will be—we hadn't talked about when we're going to set it for trial. But given the demand [Petitioner's pro se demand for speedy trial], we're going to be setting it for trial pretty quickly, and you'll have a docket sounding approximately two-and-a-half weeks in advance of trial. I would—you know, and without making any, you know, permanent ruling on it—I mean, all of this is subject to circumstances. But probably it's, you know, once we have had docket sounding and you have announced ready for trial, I'm going to look with a jaundiced eye on bringing in an attorney to attempt to get a continuance.

> I mean, the plain fact of it is, an attorney isn't going to agree to come in and represent you at the last minute. The attorney is just not going to be willing to do that. So, bringing in an attorney, if you do it within a couple of weeks of trial, is going to— either the attorney's not going to come in, or they're going to want an agreement from the Court that I give you a continuance, and I'm not likely to do that. So, that, I guess, we will have to deal with that as it comes.

(*id.* at 34–36).

The court asked Petitioner whether he had any other questions regarding the advantages or disadvantages of having a lawyer appointed to assist him; and Petitioner responded he did not (*id.* at 36–37). The court then asked Petitioner whether he was sure he did not want counsel appointed for him (*id.* at 37). Petitioner responded that he did not want counsel appointed (*id.* at 37). The court found that Petitioner was competent to waive counsel, and he knowingly and intelligently waived his right to counsel (*id.*). Based upon Petitioner's filing a demand for speedy trial (Ex. A at 19), trial was set for January 20, 2004 (*id.* at 41).

On December 24, 2003, Petitioner filed a motion for appointment of counsel (Ex. A at 25).[11] At a hearing on December 30, Petitioner initially stated he wished to have counsel appointed, and the court appointed the public defender's office (Ex. C at 3). Petitioner then withdrew his request and stated he wished to proceed pro se (*id.* at 3–5).

Petitioner filed several motions on January 5 and 6, 2004, which were heard on January 13 (Ex. A at 26–41, Ex. D). The court asked Petitioner if he wished to continue representing himself, many of his motions alluded to the fact that preparing for his case was difficult in light of his incarceration (Ex. D at 3–4). Petitioner affirmed he wished to proceed pro se (*id.* at 4). Petitioner again complained that he was unable to properly investigate his case because of his incarceration (*id.* at 7–11). The court reminded Petitioner that he had filed a demand for speedy trial, and the court read Rule 3.191 of the Florida Rules of Criminal Procedure (the speedy trial rule) to Petitioner (*id.* at 11). Petitioner then argued that the only reason he withdrew his motion for appointment of counsel on December 30 was he did not believe he should have to choose between two fundamental rights, his right to a speedy trial and his right to counsel (*id.* at 13–14). The trial court emphasized that the court never suggested Petitioner's motion to appoint counsel would be denied; the court

---

[11] Although Petitioner dated the motion "Jan. 22, 2003," the clerk's stamp indicates it was filed on December 24, 2003.

simply explained that under the speedy trial rule, the filing of a demand constituted a statement by the accused that he was prepared for trial or would be prepared for trial within five days; and the practical result of appointing counsel would be that the case would not proceed to trial as scheduled because an attorney appointed on December 30 would not assert he was ready to go to trial on two life felonies in three weeks (*id.* at 14).  Petitioner requested a two-week continuance of the trial date (*id.* at 24, 26–27).  The trial court determined that Petitioner failed to show sufficient grounds for a continuance under the following  provision of the speedy trial rule:

> A demand may not be withdrawn by the accused except on order of the court, with consent of the state or on good cause shown.  Good cause for continuances or delay on behalf of the accused thereafter shall not include nonreadiness for trial, except as to matters that may arise after the demand for trial is filed and that reasonably could not have been anticipated by the accused or counsel for the accused.  A person who has demanded speedy trial, who thereafter is not prepared for trial, is not entitled to continuance or delay except as provided in this rule.

Fla. R. Crim. P. 3.191(g) (2001).  The matter was set for trial the week of January 20, 2004.

On January 20, 2004, the court again inquired of Petitioner whether he continued to represent himself (Ex. E at 3).  Petitioner stated he wised to represent himself because he did not wish to waive his speedy trial right (*id.*).  The court clarified that appointment of counsel would not legally nullify his speedy trial demand, but practically speaking, no competent counsel would be ready to proceed to trial in three weeks and would likely request a continuance, which would effectively nullify the speedy trial demand (*id.* at 3–4).  To further clarify any confusion Petitioner may have had on that point, the court asked an assistant public defender, Mr. Rayne, to consult with Petitioner about the issue (*id.* at 4–5).  Petitioner also received a copy of a DNA report from the prosecutor (*id.* at 5).  After a recess, Mr. Rayne informed the court that he has discussed the pros and cons of self-representation with Petitioner and advised him that self-representation was unwise in light of the seriousness of the charges and Petitioner's lack of training (*id.* at 5).  Mr. Rayne also discussed with Petitioner the likely testimony of the State's witnesses and possible defenses (*id.* at 5–6).  He also stated he explained to Petitioner that the Rules of Evidence would likely preclude Petitioner from doing some of the things he wanted to do (*id.* at 6).  Mr. Rayne stated that Petitioner rejected his advice to utilize the services of a lawyer and wished to proceed to trial pro se (*id.*).  Petitioner affirmed that this was his decision, even after the court answered Petitioner's additional questions

about the speedy trial issue, explaining that even if counsel obtained a continuance, Petitioner could re-assert his right to a speedy trial (*id.* at 6–8). Apparently, a jury was selected, and both Petitioner and the prosecutor announced they were ready to proceed to trial that week (*id.* at 8; *see* also Ex. F at 6, Ex. G at 5, 8, 11, 17).

The next day, on January 21, 2004, Petitioner announced he wished to withdraw his demand for speedy trial because he was "totally unprepared," and requested that the court appoint counsel (Ex. F at 5). The court granted Petitioner's motion and appointed counsel (*id.* at 7). Due to a conflict with the public defender's office, the court appointed Frank Sheffield to represent Petitioner (Ex. A at 48, 49).

The case came on for the second jury selection on March 15, 2004, with trial to begin later that week (Ex. G at 5–6). The court first addressed Petitioner's recently-filed motion to discharge counsel and appoint alternate counsel (*id.* at 3). As grounds for his motion, Petitioner asserted Attorney Sheffield failed to communicate with him (Ex. A at 56–58). He stated that on February 9, Attorney Sheffield notified him that he was appointed to the case and advised Petitioner that if he wished to communicate with counsel, he should do so in writing or during in-person visits at the jail (*id.*). The same day, Petitioner wrote to Attorney Sheffield and requested a meeting at the jail (*id.*). On February 10, Petitioner met Attorney David, Attorney Sheffield's law partner, at a hearing, but the only words Attorney David allegedly said to him were, "We will talk." (*id.*). On February 20, 2004, Petitioner learned that defense counsel deposed the victim without first conferring with him (*id.*). On March 8, 2004, Petitioner met Attorney Sheffield for the first time, and Attorney Sheffield advised him that he would be handling the case instead of Attorney David, and he would visit Petitioner at the jail to discuss the case (*id.*). On March 11, four days before jury selection was to occur, Attorney Sheffield met with Petitioner at the jail (*id.*). The same day, Petitioner filed a motion to discharge counsel, which was received by the court on March 15, 2004 (Ex. A at 55–58). In the motion, Petitioner requested that Attorney Sheffield's firm be discharged from the case and alternate counsel appointed; and if the court denied his request to appoint alternate counsel, he wished to proceed pro se or retain alternate counsel (*id.*). Attorney David was present at the March 15 proceedings and responded that Attorney Sheffield was prepared for trial, but perhaps a continuance might resolve the issue of Petitioner's dissatisfaction with counsel (Ex. G at 6, 7).

The trial judge relayed a detailed history of the proceedings with regard to Petitioner's initial decision to represent himself, noting Petitioner's determined insistence on proceeding pro se throughout and without withdrawing his demand for speedy trial until after a jury was selected, at which time Petitioner withdrew his demand for speedy trial and requested appointment of counsel (*id.* at 9–13). The court noted that counsel had deposed the key witness in the case, and that Petitioner could have communicated with counsel in writing (*id.* at 13). The court ruled as follows:

> I think Mr. Herring is playing games with the system. I think he let it get right up to trial last time in hopes that the State could not get ready for trial, when the State was ready for trial and continued on and indicated they were ready at the last minute, after picking a jury, Mr. Herring then no longer wanted to represent himself and wanted a continuance of the matter. That was in the face of, at least, two meetings in which—in the face of three times when the Court had advised Mr. Herring he was not well-served to do that [represent himself]. So only after it was imminent, the trial was imminent, that he decide [sic] to withdraw his demand for speedy trial and seek appointment of counsel.
>
> I'm going to deny the motion to dismiss current counsel and appoint alternate counsel. I'm going to deny the verbal motion to continue on Mr. David's behalf here today and we will proceed to trial.

(*id.* at 13).

At that point in the proceedings, Petitioner was removed from the courtroom for misbehavior (*id.* at 13–14). After a recess, the court asked the bailiff to invite Petitioner back to the courtroom (*id.* at 14–15). The bailiff did so and stated on the record that Petitioner responded that he did not want defense counsel to represent him and would proceed pro se (*id.* at 15). When Petitioner returned to the courtroom, he advised the court that he preferred to proceed with alternate counsel, but if the court denied his request to appoint alternate counsel, he preferred to proceed pro se (*id.* at 16). The court advised Petitioner that it had denied his motion to dismiss counsel and appoint alternative counsel because Petitioner had not shown that appointed counsel performed ineffectively (*id.* at 16). The court advised Petitioner that he could proceed to trial with Attorney Sheffield or represent himself (*id.* at 17). Petitioner responded that he did not want Attorney Sheffield's office representing him, and he would proceed pro se (*id.*). The court asked Attorney David to remain in the courtroom as standby counsel (*id.* at 17–18).

At the start of trial two days later, the court noted that Attorneys Sheffield and David were present, and the court inquired of Petitioner whether he wished to reconsider his decision to represent himself (Ex. H at 4–6). Petitioner stated he did not want the assistance of either attorney, even as standby counsel (*id.* at 6). The court then excused standby counsel, and Attorneys Sheffield and David left the courtroom. A few hours later, after three breaks in the proceedings, Petitioner stated he did not wish to proceed pro se and requested appointment of counsel (*id.* at 17). The court denied the motion, stating:

> That request will be denied. Mr. Herring, we started into this trial yesterday by picking a jury. The trial has commenced. I gave you every opportunity to change your mind. I had counsel here this morning. You rebuffed our efforts to provide you with counsel and now that you see that by asking for counsel at in [sic] point you could delay the proceedings. Now, you wish to ask for counsel. Your request is too late. We will proceed with trial.

(*id.* at 17–18).

It is clear from the record that Petitioner repeatedly expressed his desire to represent himself throughout the proceedings. When he twice changed his mind and requested appointment of counsel, the court granted his requests. Then, when Petitioner reasserted his right to represent himself (upon the court's denial of Petitioner's motion to discharge Attorney Sheffield's office on the ground that Petitioner failed to show that counsel was providing ineffective assistance), the court honored Petitioner's right of self-representation (in accordance with <u>Faretta</u>) and maintained Attorney Sheffield's office only as standby counsel. Two days later, on the day of trial, Petitioner clearly and unequivocally stated he did not want the assistance of Attorney Sheffield's office even as standby counsel, knowing that the court would not appoint another lawyer to represent him. Although Petitioner did not affirmatively state <u>at that time</u> that he desired to proceed pro se, and he requested appointment of counsel a few hours later (after the court discharged Attorney Sheffield's office, and the attorneys left the courtroom), the record shows that by Petitioner's conduct, he voluntarily waived his right to counsel.

Furthermore, the record shows that Petitioner's waiver was knowing and intelligent. Early in the proceedings, Petitioner was thoroughly advised by the trial court of the dangers and disadvantages of proceeding pro se; and as the case progressed, Petitioner even consulted with two different attorneys, each of whom discussed case-specific disadvantages of self-representation with

him and encouraged him to accept the services of an attorney. Moreover, the court ascertained that Petitioner was forty-one (41) years old; he could read and write English; he had no difficulty understanding English; he received some post-high school education; he was never diagnosed with or treated for any mental illness; he was not under the influence of any drugs or alcohol; he did not have any physical problem that would hinder his self-representation; and he understood the charges against him and the maximum penalties he faced. Thus, Petitioner's waiver of his right to counsel was also knowing.

In light of the record evidence supporting the inference that Petitioner knowingly and voluntarily waived his right to counsel, and the dearth of evidence pointing to the opposite conclusion, the undersigned concludes Petitioner has not met his burden of proving that he did not knowingly or voluntarily waive counsel. Therefore, he is not entitled to habeas relief on his claim that the trial court denied his constitutional right to counsel. *See* Jones, 540 F.3d at 1292; Garey, 540 F.3d at 1253; *see also, e.g.*, United States v. Turner, 364 Fed. Appx. 569 (11th Cir. 2010) (defendant made intentional and knowing waiver of Sixth Amendment right to counsel when he rejected competent, conflict-free counsel after district court informed him of consequences of rejecting that counsel; defendant maintained that district court had no jurisdiction over his case and thus repeatedly refused to accept counsel appointed to him, yet he denied he was seeking to represent himself; district court strongly cautioned defendant against refusing appointed counsel, and stressed the seriousness of the charges against him, penalties he faced, and overall complexity of the case; district court explored defendant's educational background, his general understanding of the legal system and rules of criminal procedure and evidence, and his specific understanding of the charges against him, and district court nonetheless appointed federal public defender previously assigned to his case as standby counsel); United States v. Posadas-Aguilera, 336 Fed. Appx. 970 (11th Cir. 2009) (in prosecution for illegal reentry after conviction of a felony, district court did not violate defendant's Sixth Amendment right to counsel by permitting him to represent himself at trial and sentencing; district court was best able to observe defendant and, through its observation, determined that he understood choices before him, knew potential dangers of proceeding pro se, and affirmatively rejected federal public defender for trial, and court repeatedly warned defendant of dangers and disadvantages of self-representation, and record showed that defendant's choice was

knowing and voluntary, and defendant did not show that he suffered from significant mental illness to such extent that his choice could not be considered intelligent); United States v. Talley, 315 Fed. Appx. 134 (11th Cir. 2008) (defendant, who was charged with conspiracy to impede or injure an Officer of the United States and endeavoring to influence, intimidate, or impede an officer of the United States, knowingly and intelligently waived right to counsel; defendant had sufficient knowledge of charges against him; magistrate judge informed defendant of offenses charged in original indictment and informed him of specific sentence he faced; when defendant was arraigned on superseding indictments, district court informed him of crimes he was charged with and severity of penalties attached to them; defendant possessed adequate familiarity with relevant procedural and evidentiary rules, and examining psychologist opined that defendant's seemingly nonsensical use of legal jargon was tactic designed to manipulate proceedings).[12]

    B.    <u>Ground Two: "Petitioner was denied the assistance of counsel in the preparation of a 'Motion for New Trial.'"</u>

Petitioner states after the jury returned its verdict, he filed a motion requesting appointment of counsel to assist him with filing a motion for new trial (Doc. 4 at 5). Petitioner asserts the trial court refused to appoint counsel at this critical stage in the proceedings, which prevented him from filing a motion for new trial (*id.*). Petitioner contends he exhausted this claim by raising it in his Rule 3.850 motion and his motion for rehearing upon the court's denial of the motion (*id.* at 6).

Respondent contends Petitioner failed to exhaust the claim because he made only a passing reference to "denial of counsel" with regard to a motion for new trial in his Rule 3.850 motion (Doc. 25 at 17). Respondent acknowledges that Petitioner argued in his motion for rehearing that the "window period" for filing a motion for new trial was a critical stage in the proceedings for which he was entitled to counsel, but this argument was not properly before the court because it was raised for the first time in a motion for rehearing (*id.*). Respondent additionally contends even if Petitioner exhausted the claim, it is without merit (*id.* at 18–20).

Upon review of the post-conviction record, the undersigned concludes that Petitioner fairly presented this claim to the state courts. In Ground One of his Rule 3.850 motion, he argued not only that the trial court denied his constitutional right to counsel by denying his request for counsel

---

[12] The undersigned cites <u>Turner</u>, <u>Posadas-Aguilera</u>, and <u>Talley</u> only as persuasive authority and recognizes that the opinions are not considered binding precedent. *See* 11th Cir. R. 36-2.

during trial, but also that the court committed constitutional error by failing to appoint counsel "at the time of Motion For New Trial" (Ex. Q at 78–79). Petitioner also included argument on this issue in his supporting memorandum (*id.* at 110–11). Therefore, Petitioner fairly presented his claim that the trial court denied his Sixth Amendment right to counsel by failing to appoint counsel during the time frame for filing a motion for new trial.

In the order denying post-conviction relief, the state court addressed only Petitioner's argument that the court erred by failing to appoint counsel for trial (*id.* at 237). As to that claim, the court concluded it was procedurally barred because it was raised and addressed on direct appeal (*id.*). The court thus did not adjudicate the merits of Petitioner's claim that the court denied him counsel during the time period for filing a motion for new trial. Additionally, this claim was not raised on direct appeal. As previously noted, the only issue raised on direct appeal was the trial court's failure to conduct a <u>Nelson</u> inquiry prior to denying Petitioner's motion to discharge counsel. Because Petitioner fairly presented his claim to the state courts in his Rule 3.850 motion but did not receive an adjudication on the merits, the court will review the claim de novo.

The Florida Rules of Criminal Procedure provide that a motion for new trial may be made within ten (10) days after the rendition of the verdict. Fla. R. Crim. P. 3.590(a). In jury trials, the rendition of the verdict occurs when the verdict is announced and entered of record. Fla. R. Crim. P. 3.440. In the instant case, the verdict was rendered on March 18, 2004 (Ex. A at 70–71, Ex. H at 276–77). Therefore, the deadline for filing a motion for new trial was March 28, 2004. Immediately upon dismissal of the jury, the court advised Petitioner that they were moving into the sentencing phase, for which Petitioner had a right to counsel (Ex. H at 279). The court inquired whether Petitioner wished to have counsel appointed, and Petitioner responded that he did (*id.*). The court appointed the public defender's office, and the docket sheet reflects the appointment (*id.* at 280; *see also* Ex. Y at 5). The court noted that the public defender's office may have previously indicated a conflict and stated that if that was the case, he would appoint Attorney Banks' firm in light of Petitioner's displeasure with Attorney Sheffield's firm (Ex. H at 279–80). The court set a case management hearing for March 23, 2004 (Ex. H at 280, Ex. Y at 5). Attorney Banks filed a notice of appearance on March 25, 2004 (Doc. 30 at 29, Ex. AA; *see also* Doc. 16, Ex. Y at 5). The

order actually appointing Attorney Banks' firm as conflict counsel was signed March 30, 2004 (Ex. A at 74).

Based upon this record, Petitioner has failed to demonstrate that the trial court denied him counsel during the ten-day period for filing a motion for new trial. In support of his assertion that the court failed to appoint counsel during the ten-day window, Petitioner states in his reply brief that Attorney Robert Morris, Mr. Banks's law partner, told him in a letter dated April 20, 2004, that the Banks firm was not appointed to represent him until the jurisdictional window for filing a motion for new trial had passed (*see* Doc. 30 at 8 (referencing letter submitted by Petitioner as an exhibit to his Rule 3.850 motion) (emphasis added)). However, this statement by Attorney Morris does not refute the record evidence that the court appointed the public defender's office on March 18, 2004, within the jurisdictional window. Additionally, Attorney Morris's statement is refuted by record evidence that Attorney Banks filed a notice of appearance on March 25, 2004, which was also within the ten-day jurisdictional window (*see* Ex. Y at 5; Doc. 30 at 29, Ex. AA). Furthermore, Attorney Morris himself refuted his own statement in his response to a Florida Bar complaint filed against him by Petitioner, in which Attorney Morris states he was present in the courtroom during portions of Petitioner's trial; at the conclusion of Petitioner's trial, the court appointed the public defender's office to represent Petitioner; the public defender's office immediately withdrew due to a conflict of interest; and the Banks firm was appointed to represent Petitioner on March 23, 2004 (*see* Ex. Q at 72–76, attached pages 2 and 4 of reply to bar complaint). In that response, Attorney Morris acknowledges that the Banks firm filed a notice of appearance on March 25, 2004; and Morris states he immediately began investigating the case to determine whether there were grounds for filing a motion for new trial (*id.*). Moreover, Petitioner acknowledged in his state habeas petition, which he signed under penalties of perjury, that prior to March 30, 2004, Attorney Morris was "already involved in the case and making decisions" (Ex. U at 19). Therefore, Petitioner has failed to demonstrate that the trial court deprived him of his constitutional right to counsel during the ten-day window for filing a motion for new trial.

C.  Ground Three: "Ineffective assistance of counsel for failing to consult with Petitioner to develop the facts of the case."

Petitioner states Attorney Sheffield visited him only once from the date Sheffield's office was appointed to represent him until the week prior to trial (Doc. 4 at 6). Petitioner states the visit

lasted less than ten (10) minutes, and Attorney Sheffield did not explain the defense strategy, instead he seemed concerned only with whether Petitioner had a suit to wear for trial (*id.* at 7). Petitioner asserts if Attorney Sheffield had properly consulted with him, he would have discovered grounds for seeking suppression of evidence seized from his vehicle (knives), which was presented by the State at trial (*id.*).[13] Petitioner states he presented this claim in his Rule 3.850 motion (*id.* at 6).

Respondent concedes that Petitioner exhausted this claim by presenting it as Ground Four in his Rule 3.850 motion (Doc. 25 at 20). Respondent contends Petitioner has failed to show that the state court's adjudication of the claim was based upon an unreasonable determination of the facts or contrary to or an unreasonable application of clearly established federal law (*id.* at 21).

1. Clearly Established Supreme Court Law

The standard for evaluating claims of ineffective assistance of counsel is set forth in Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). To obtain relief under Strickland, Petitioner must show (1) deficient performance by counsel and (2) a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different. 466 U.S. at 687–88. If Petitioner fails to make a showing as to either performance or prejudice, he is not entitled to relief. *Id.* at 697. Thus, this court need not address the prejudice prong if the court determines that the performance prong is not satisfied. Turner v. Crosby, 339 F.3d 1247, 1279 (11th Cir. 2003); Holladay v. Haley, 209 F.3d 1243, 1248 (11th Cir. 2000) ("Because both parts of the test must be satisfied in order to show a violation of the Sixth Amendment, the court need not address the performance prong if the defendant cannot meet the prejudice prong, or vice versa.") (citation omitted).

"The petitioner's burden to prove, by a preponderance of the evidence, that counsel's performance was unreasonable is a heavy one." Jones v. Campbell, 436 F.3d 1285, 1293 (11th Cir. 2006) (citing Chandler v. United States, 218 F.3d 1305, 1313 (11th Cir. 2000) (en banc)). The focus of inquiry under the performance prong is "reasonableness under prevailing professional norms." Strickland, 466 U.S. at 688–89. "Judicial scrutiny of counsel's performance must be highly

---

[13] The victim testified that after Petitioner sexually assaulted her at their home, he told her he would take her to school, so the two of them left the house in his truck (Ex. H at 99–23). She testified that at one point, he stopped the truck in the woods and told her to "go down on him" (*id.* at 124–26). She testified that he threatened to stab her if she refused, and she saw two knives in the truck (*id.* at 126–27). The victim identified two knives as the knives in her father's truck, and the knives were admitted into evidence (*id.* at 127–28).

deferential," and courts should make every effort to "eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689. If the record is not complete regarding counsel's actions, "then the courts should presume 'that what the particular defense lawyer did at trial—for example, what witnesses he presented or did not present—were acts that some lawyer might do." Jones, 436 F.3d at 1293 (citing Chandler, 218 F.3d at 1314–15 n.15). Counsel's performance is deficient only if it is "outside the wide range of professional competence." Jones, 436 F.3d at 1293 (citing Strickland, 466 U.S. at 690); Lancaster v. Newsome, 880 F.2d 362, 375 (11th Cir. 1989) (emphasizing that petitioner was "not entitled to error-free representation").

> As stated by the Eleventh Circuit:
>
> No absolute rules dictate what is reasonable performance for lawyers. [citing Strickland, 104 S.Ct. at 2065; other citations omitted]. "Any such set of rules would interfere with the constitutionally protected independence of counsel and restrict the wide latitude counsel must have in making tactical decisions." Strickland, 104 S.Ct. at 2065; [other citations omitted]. The law must allow for bold and for innovative approaches by trial lawyers. And, the Sixth Amendment is not meant "to improve the quality of legal representation," but "simply to ensure that criminal defendants receive a fair trial." Strickland, 104 S.Ct. at 2065.

Chandler, 218 F.3d at 1307. However, not every strategic decision passes constitutional muster. Whether a particular decision by counsel was a tactical one is a question of fact, Hardwick v. Crosby, 320 F.3d 1127, 1163 (11th Cir. 2003), and the state court's resolution of that issue enjoys a strong presumption of correctness. *See* 28 U.S.C. § 2254(e)(1); Jackson v. Herring, 42 F.3d 1350, 1367 (11th Cir. 1995); Horton v. Zant, 941 F.2d 1449, 1462 (11th Cir. 1991). Whether a particular tactical decision was a reasonable one, however, is a question of law, Hardwick 320 F.3d at 1163; Jackson, 42 F.3d at 1367; Horton, 941 F.2d at 1462. In determining whether counsel's decision was reasonable, "every effort [must] be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Strickland, 466 U.S. at 689.

As to the prejudice prong of the Strickland standard, Petitioner's burden of demonstrating prejudice is high. Wellington v. Moore, 314 F.3d 1256, 1260 (11th Cir. 2002). The Supreme Court has cautioned that "'[i]t is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding.'" *Id.* (quoting Strickland, 466 U.S. at 693). However, the

Court has also clarified that a petitioner need not demonstrate it 'more likely than not, or prove by a preponderance of evidence,' that counsel's errors affected the outcome. Strickland, 466 U.S. at 693–94. Instead,

> The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.

Id. at 694. Indeed, it would be "contrary to" the law clearly established in Strickland for a state court to reject an ineffectiveness claim for failing to prove prejudice by a preponderance of the evidence. Williams v. Taylor, 529 U.S. at 405–406.

The prejudice assessment does "not depend on the idiosyncracies of the particular decisionmaker," as the court should presume that the judge or jury acted according to law. Strickland, 466 U.S. at 694–95. "When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." Id. at 695.

2.      Federal Review of State Court Decision

Petitioner raised this claim of ineffective assistance of counsel as Ground Four in his Rule 3.850 motion (Ex. Q at 90–91,123–28). Petitioner argued that his vehicle, a green 1997 Toyota truck, was illegally seized by police because it was parked on private property (in the front yard of a distant relative) when police seized it (id. at 91, 118). Petitioner acknowledged that a police officer testified that he received information that Petitioner was at the relative's house, and the officer observed the vehicle at the house; however, Petitioner was not there (id. at 118). Petitioner states the police did not have probable cause to seize or search the vehicle; further, a warrant to search the vehicle had not been issued at the time the vehicle was seized (id.).

The state court denied the claim, and the decision was affirmed by the First DCA. While the affirmance was a per curiam opinion without reasoning, this court presumes that the First DCA's decision affirms the reasoning, as well as the judgment, of the circuit court. "'Where there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground.'" Sweet v. Sec'y Dept. of Corr., 467 F.3d 1311, 1316–17 (11th Cir. 2006) (quoting Ylst v. Nunnemaker, 501 U.S. 797, 803, 111 S.

Ct. 2590, 2594, 115 L. Ed. 2d 706 (1991)); *see also* <u>Harmon v. Barton</u>, 894 F.2d 1268, 1273 (11th Cir. 1990) (noting that the "clear inference" to be drawn from a per curiam affirmance without written opinion is that the appellate court "accepted not only the judgment but the reasoning of the trial court.").

In the trial court's written opinion denying Petitioner's claim, the court identified the <u>Strickland</u> standard as the controlling legal standard for analyzing claims of ineffective assistance of counsel (Ex. Q at 240). Because the state court correctly identified <u>Strickland</u> as the governing precedent, Petitioner is entitled to federal habeas relief only if he demonstrates that the state court decision was based upon an unreasonable determination of the facts or was an unreasonable application of <u>Strickland</u>.

The state court concluded that since Petitioner proceeded pro se at trial, he was prohibited from arguing that his counsel was ineffective (Ex. Q at 239–40). The court further concluded that Petitioner failed to show he was prejudiced by his pre-trial counsel's actions because the search of Petitioner's vehicle was properly and lawfully executed; therefore, a motion to suppress would have been fruitless (*id.* at 240). In support of this conclusion, the court attached a portion of the trial transcript that included testimony of Deputy Joseph Reilly (*id.* at 260–72).

Petitioner has failed to show that the state court's adjudication of the claim was unreasonable. If a vehicle is readily mobile and probable cause exists to believe that the vehicle contains evidence or contraband or that the vehicle was involved in the commission of a crime, the Fourth Amendment permits police to search and seize the vehicle without more. *See* <u>Pennsylvania v. Labron</u>, 518 U.S. 938, 940, 116 S. Ct. 2485, 135 L. Ed. 2d 1031 (1996); <u>United States v. Lindsey</u>, 482 F.3d 1285, 1293 (11th Cir. 2007) (citing <u>United States v. Watts</u>, 329 F.3d 1282, 1286 (11th Cir. 2003)); <u>Mylock v. State</u>, 750 So. 2d 144, 147–48 (Fla. 1st DCA 2000). All that is required to satisfy the first prong is that the vehicle is operational. <u>Lindsey</u>, 482 F.3d at 1293 (citing <u>Watts</u>, *supra*). Additionally, "[t]here is no requirement that the warrantless search of a vehicle occur contemporaneously with its lawful seizure" or that other "exigent circumstances" exist. *Id.* (quoting <u>United States v. Johns</u>, 469 U.S. 478, 105 S. Ct. 881, 885, 83 L. Ed. 2d 890 (1985)). Probable cause for the search exists when "under the totality of the circumstances, there is a fair probability that

contraband or evidence of a crime will be found in the vehicle." *Id.* (quoting United States v. Tamari, 454 F.3d 1259, 1264 (11th Cir. 2006) (citation and internal quotation marks omitted)).

In the instant case, Deputy Cedric Tryman testified that on November 3, 2003, he interviewed the child victim and the victim's mother (Ex. H at 141). A description of the victim's statements to Deputy Tryman is included in the Summary of Offense and Probable Cause Affidavit which is included in state court record (Ex. A at 6–9). The victim stated that earlier that day (November 3), Petitioner forcibly raped her and held her against her will (*see* Ex. A at 6). The victim stated that the incidents occurred at their residence, and Petitioner also forced her into his vehicle and drove her to an unknown wooded area, whereupon he held her at knife point and forced her to submit to sexual intercourse (*id.*). She stated she was also forced to perform oral sex on him (*id.*). Deputy Tryman testified that after the interview, Detective Wierenga was assigned to the case (*id.* at 141–42). Detective Wierenga testified that on November 3, she met with the victim, the victim's mother, and Deputy Tryman at the Child Protection Team ("CPT") office (Ex. H at 159–60). She testified that she obtained a sworn statement from the victim and collected a "sexual assault kit" and the victim's clothing (*id.* at 160–61). That statement is also included in the probable cause affidavit, as is the CPT nurse's report that her physical examination of the victim showed indications of genital trauma consistent with sexual abuse (Ex. A at 6–9). Detective Wierenga also testified that the victim's mother gave them consent to search the residence, where the initial sexual assault occured, and Wierenga observed several conditions which were consistent with the victim's description of the assault (Ex. H at 162–64). Detective Wierenga testified that she provided other law enforcement officers with a description of Petitioner's person and his vehicle, and an extra patrol was placed on the victim's residence and the surrounding area in the hopes of apprehending Petitioner (*id.* at 164). She testified that on the next day, November 4, 2003, she presented a probable cause affidavit to a judge, and the judge issued an arrest warrant for Petitioner (*id.* at 164–64). Detective Wierenga testified that she was notified later that evening that Petitioner had been arrested, and his vehicle located and impounded (*id.* at 165). She testified that the next day, November 5, she obtained a warrant to search Petitioner's vehicle (*id.*).

Deputy Joseph Reilly testified that on November 3, 2003, he responded to a dispatch to a residence located at 2486 Seasons Lane, on information that Petitioner, a suspect in a sexual assault,

may be located there (*id.* at 48).  Deputy Reilly testified that upon arrival, he learned that Petitioner was not at the residence, but Petitioner's vehicle was there (*id.*).  He testified that the vehicle was a green Toyota pick-up truck (*id.* at 49).  Reilly testified that the licence plate number of the vehicle matched the license plate number provided to officers in the BOLO (Be On the Look Out) as being involved in the commission of the crimes; and he determined that the vehicle was registered to Petitioner (*id.*).  Deputy Reilly testified that based upon this information, the vehicle was impounded (*id.* at 53–54).

In light of the victim's statements to the police (including, that Petitioner sexually assaulted her in the home, threatened to kill her, then drove her to the woods in his truck, threatened to stab her, sexually assaulted her again, and she saw knives in the truck), which were corroborated by the results of the CPT nurse's physical examination and Detective Wierenga's observations of the home, the officers had sufficient evidence to believe that the vehicle was readily mobile, and the police had probable cause to believe that the vehicle contained evidence or was involved in the commission of a crime.  Petitioner therefore failed to show a reasonable probability that any investigation by counsel into the suppression issue or any effort to seek suppression of the evidence discovered in the truck would have been successful.  Therefore, the state court's denial of his claim was not based upon an unreasonable determination fo the facts or contrary to or an unreasonable application of Strickland.

    D.    Ground Four: "Ineffective assistance of counsel for failing to have independent tests done on the State's scientific evidence."

Petitioner states Attorney Sheffield failing to seek independent testing of evidence, including items of clothing removed from a laundry basket at Petitioner's home (Doc. 4 at 6).  Petitioner states the evidence was very incriminating, and it was "very possible" that the clothing was "tainted" (*id.* at 8).

Respondent concedes that Petitioner exhausted this claim by presenting it as Ground Four in his Rule 3.850 motion (Doc. 25 at 21).  Respondent contends Petitioner has failed to show that the state court's adjudication of the claim was based upon an unreasonable determination of the facts or contrary to or an unreasonable application of clearly established federal law (*id.* at 22).  Respondent states Deane Johnson, the serologist who testified at Petitioner's trial, testified that Petitioner's semen was not found on the victim's clothing; and Petitioner cross-examined Ms.

Johnson on this testimony, challenging her with the seeming discrepancy that he was alleged to have ejaculated into the victim's vagina, but no semen was found on her underwear (*id.*). Respondent additionally contends Petitioner provided no factual basis for his speculation that an expert could have provided any more relevant evidence on this issue; therefore, his claim is unsupported (*id.*).

In Petitioner's reply, he states an independent expert could have refuted an inconsistency in Ms. Johnson's testimony (Doc. 30 at 13–15). Petitioner states Ms. Johnson first testified that she could not identify the source of Petitioner's DNA found on the victim's breast but subsequently testified that the source of that DNA was Petitioner's saliva (*id.* at 14–15). Petitioner asserts an independent expert could have conducted further testing to show that the source of the DNA was not Petitioner's saliva but another of many potential sources, since Petitioner and all of his children, including the victim, shared the same utensils, used the same facilities, sat on the same furniture, used the same hairbrushes, mixed their clothing, and sometimes even wore the same clothing (*id.* at 14–15).

1.      Clearly Established Federal Law

The clearly established Supreme Court law governing claims of ineffective assistance of counsel is the two pronged Strickland standard described *supra*. Pursuant to Strickland, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. Strickland, 466 U.S. at 691. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments. *Id.* "One of the primary duties defense counsel owes to his client is the duty to prepare himself adequately prior" to a legal proceeding. Lawhorn v. Allen, 519 F.3d 1272, 1295 (11th Cir. 2008) (quoting Magill v. Dugger, 824 F.2d 879, 886 (11th Cir. 1987)). Such preparation includes an understanding of the legal procedures and the legal significance of tactical decisions within those proceedings. Young v. Zant, 677 F.2d 792, 794, 799–800 (11th Cir. 1982) (an attorney's reliance on former law and unawareness of procedure deprived his client of effective assistance). Counsel's decision whether to call a particular witness is a matter of trial strategy entitled to great deference. Chandler, 218 F.3d at 1314 n.14 (citing Waters v. Thomas, 46 F.3d 1506, 1512, 1518–19 (11th Cir. 1995) (en banc)). "Complaints of uncalled witnesses are not favored, because the presentation of testimonial evidence

is a matter of trial strategy and because allegations of what a witness would have testified are largely speculative." Buckelew v. United States, 575 F.2d 515, 521 (5th Cir. 1978).[14]

        2        Federal Review of State Court Decision

Petitioner raised this ineffective assistance of counsel claim as Ground Four in his Rule 3.850 motion (Ex. Q at 92–94, 125). The state court denied the claim, and the First DCA affirmed. In the trial court's written decision, the court concluded that Petitioner failed to demonstrate that defense counsel's failure to seek independent analysis of biological samples taken from the victim and Petitioner was unreasonable, given that identification was not at issue (the victim was Petitioner's own daughter) (Ex. Q at 240).

As previously noted, the state court applied the correct legal standard to Petitioner's ineffective assistance of counsel claims. Therefore, Petitioner is entitled to relief only if he demonstrates that the state court's application of Strickland was unreasonable.

Petitioner's assertions as to the substance of an independent expert's trial testimony are purely speculative and, therefore, insufficient to show a reasonable probability that the result of his trial would have been different. Furthermore, even if an expert had testified that the source of Petitioner's DNA on the victim's breast could have been other than his saliva, there is no reasonable basis to conclude that this testimony probably would have affected the outcome of trial.

The victim, who had just turned eighteen (18) years old at the time she testified at Petitioner's trial (which occurred four months after the crimes were committed), testified that at approximately 10:00 a.m. on November 3, 2003, Petitioner woke her and told her he had a dream that she was having sex with people (Ex. H at 99–104). The victim stated Petitioner was wearing a bathrobe at the time (*id.* at 102–03). She stated Petitioner retrieved a Bible from another room and asked her to read a certain passage which related to a man sleeping with his daughters (*id.* at 104–05). The victim stated Petitioner went into the other room, and she followed him to replace the Bible (*id.* at 105–06). She stated she looked at her dad, and the robe he was wearing was open so she could see he had nothing on underneath it (*id.* at 106–07). The victim testified that Petitioner told her, "Sugar, I'm going to break you in" (*id.* at 108). Petitioner then went to the bathroom and

---

[14] In Bonner v. City of Prichard, 661 F.2d 1206 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all former Fifth Circuit decisions rendered before October 1, 1981.

opened a box containing crack cocaine and a pipe (*id.* at 108–10). He smoked the crack and tried to blow the smoke in the victim's mouth by placing his mouth against hers and trying to blow into it, but she began turning her head (*id.* at 110). Petitioner told her he was going to make her "ready for the world" so she could use her beauty for money (*id.*). Petitioner then took her by the arm to her mother's room and tried to put his penis in her vagina (*id.* at 111–14). The victim testified that his penis touched her vagina, but he was unable to get it inside of her (*id.* at 114). She testified that Petitioner put his mouth on her ear, mouth, breast, and neck (*id.* at 115). She told him she did not want to get pregnant by her father, so Petitioner went to another room and returned with a condom (*id.* at 115–16). The victim testified that prior to this occurrence, she had not had sex with anyone (*id.* at 116). She testified that Petitioner again tried to penetrate her using a condom, and at some point, he ejaculated (*id.* at 116– 18). She stated that after he ejaculated, he told her to take a bath (*id..* at 118). She went into the bathroom, and the tub was full of water, so she washed herself in the tub (*id.* at 118–19). Then Petitioner got into the tub and washed his penis and the rest of his body (*id.* at 119). Petitioner smoked more crack cocaine, and again attempted to put his penis in his daughter's vagina (*id.* at 119–20). The victim testified he put his penis on her vagina, again wearing a condom, but she was not sure whether it was inside her (*id.* at 120). Petitioner stopped when he heard dogs barking (*id.* at 120–21). She testified that while they were in the house, Petitioner told her if she did not have sex with him, he would kill both of them (*id.* at 124).

The victim testified that the two of them left the house, and she thought Petitioner was taking her to school, but he just drove around (*id.* at 122–23). She stated that at one point, he stopped his truck in the woods, walked to the passenger side, where she was sitting, and told her to "go down on him" or he would stab her (*id.* at 124– 26). The victim testified that she saw two knives in the truck, and she identified the knives at trial (*id.* at 126–27). She stated she complied with his order to preform oral sex on him, and then he tried to have sex with her again (*id.* at 129–30). She testified he was wearing the same condom he had previously worn, and he was able to get his penis in her vagina (*id.* at 130). The victim testified they began driving again, and he finally took her to school at 3:15 (*id.* at 132–33). She stated the during the ride, Petitioner told her he did a bad thing and regretted it, but then told her she would thank him in the end, and that he could relate to her (*id.* at 131–33). The victim stated she went to school and told them she needed to call her mother (*id.*

at 134). Her mother picked her up from school, and she went to her aunt's house, where she told her mother what happened (*id.*).

Angela Myers, a certified sexual assault nurse examiner, testified that she examined the victim on November 3, 2003, at 7:40 p.m. (*id.* at 67–70). She testified that the victim was very upset and appeared despondent and sad (*id.* at 69). Ms. Myers testified that she performed a gynecological examination and found an abrasion and a tear on the victim's hymen that was oozing bright red blood (*id.* at 74–76). She also observed that the tissue at the bottom of the vagina was red, and she observed a large abrasion that was oozing bright red blood (*id.* at 76). Ms. Myers testified that the injuries were consistent with the victim's description of the events that occurred earlier that day (*id.* at 77). Ms. Myers testified that she swabbed the victim's ear and breasts to collect any skin cells or semen that may be present, because the victim told her Petitioner had kissed her there (*id.* at 77–78). She also swabbed several other areas of the victim's body (*id.* at 78–80). On cross-examination, Ms. Myers testified that the victim's injuries could have occurred during consensual sex (*id.* at 86–87). She also testified that her findings were diagnostic of genital trauma, but she could not say whether or not it was caused by sexual assault (*id.* at 93).

Deanne Johnson testified as an expert in the field of serology and DNA typing and testing (*id.* at 78). She testified that she tested several items including the victim's panties and clothing, the sexual assault evidence kit, clothing from a laundry basket at the victim and Petitioner's home, a washcloth, swabs of several areas of the victim's body, a carpet sample from the vehicle, and swabs of areas of the passenger side of the vehicle (*id.* at 187–88). She testified that she did not find semen on any of the victim's clothing or other items she listed, including the swabs; however, she stated it was not unusual that she did not find semen on the vaginal swabs if the victim washed herself or the perpetrator used a condom (*id.* at 189). She testified that she found Petitioner's DNA on the swabs from the victim's breasts and right ear (*id.* at 190). Ms. Johnson testified that she was not able to state the source of Petitioner's DNA on the victim's breast (*id.*). The prosecutor subsequently asked her whether Petitioner's saliva was present on the victim's breast and ear, and Johnson answered, "Well, based on the match, I would say it's nearly impossible that it could have been from someone else." (*id.*). On cross-examination, Ms. Johnson testified that it was not unusual for semen not to be found in panties even though a sexual assault had occurred (*id.* at 196–97).

Petitioner testified on his own behalf (*id.* at 213–25). He testified that his daughter fabricated the allegations because he had just received $40,000.00 as a settlement due to an injury at work, and he had announced to the family that he intended to leave (*id.* at 213–16). He testified that the victim and her mother took all of his money (*id.* at 219). He also testified that after his daughter made the allegations against him, she wrote a statement stating that she wanted the charges against him dismissed (*id.* at 216–17). The victim's written statement was admitted into evidence and published to the jury (*id.*). Petitioner testified that the victim admitted to him that she had been sneaking boys into the house (*id.* at 219). He also stated that he took her to school on November 3, 2003 (*id.* at 220). He stated that on the night he was arrested, the police were "circling the neighborhood," and he "panicked" and ran because he "thought it had something to do with drugs" (*id.* at 221–22). When the prosecutor cross-examined Petitioner as to how his saliva came to be on his daughter's breast, Petitioner responded that it was a known fact that evidence is sometimes planted (*id.* at 225).

Even assuming that an independent expert would have testified as Petitioner speculates, that is, that the source of Petitioner's DNA on the victim's breast could have been other than his saliva, Petitioner has failed to demonstrate a reasonable probability that the jury's verdict would have been different. Therefore, the state court's determination that Petitioner failed to show he was prejudiced by counsel's failure to obtain independent testing of the evidence was not an unreasonable application of <u>Strickland</u>.

E.   <u>Ground Five: "Ineffective assistance of counsel for failing to subpoena material witness Ruth A. Frazier."</u>

Petitioner asserts Attorney Sheffield failed to ensure that Ruth Frazier, Petitioner's "common law wife" and the mother of the victim, was available to testify at trial (Doc. 4 at 9). Petitioner states Ms. Frazier was present when the victim was physically examined by the CPT nurse and would have testified, (1) there was nothing wrong with her daughter, and (2) she observed her daughter laughing and talking on the telephone the day after the alleged crime (*id.*). Petitioner states this testimony would have refuted and cast doubt on the State's medical evidence (*id.*).

Respondent concedes that Petitioner exhausted this claim by presenting it as Ground Four in his Rule 3.850 motion (Doc. 25 at 23). Respondent contends Petitioner has failed to show that the state court's adjudication of the claim was based upon an unreasonable determination of the facts

or contrary to or an unreasonable application of <u>Strickland</u> (*id.* at 23–24). Respondent argues there is no evidence that Petitioner made any attempt to call Ms. Frazier as a witness, and he cannot blame former counsel for failing to foresee that Petitioner would wish to call her as a witness after Petitioner fired counsel (*id.* at 23). Additionally, in light of Angela Myers' testimony regarding the results of her examination, it is doubtful that Ms. Frazier's alleged testimony (as asserted by Petitioner) would have been particularly helpful to the defense (*id.* at 23–24).

> 1.    Clearly Established Federal Law

The clearly established Supreme Court law governing claims of ineffective assistance of counsel is the two pronged <u>Strickland</u> standard described *supra*.

> 2    Federal Review of State Court Decision

Petitioner raised this ineffective assistance of counsel claim as Ground Four in his Rule 3.850 motion (Ex. Q at 92). The state court denied the claim, and the First DCA affirmed. In the trial court's written decision, the court concluded that since Petitioner fired his defense counsel prior to jury selection, decided to represent himself, and announced to the trial court that he was ready for trial, it was his own obligation to ensure that his witnesses were available for trial (*id.* at 240). Therefore, Petitioner failed to demonstrate that defense counsel performed deficiently (*id.*).

As previously noted, the state court applied the correct legal standard to Petitioner's ineffective assistance of counsel claims. Therefore, Petitioner is entitled to relief only if he demonstrates that the state court's application of <u>Strickland</u> was unreasonable.

As with Petitioner's previous claim, his assertions as to the substance of Ms. Frazier's trial testimony are purely speculative and, therefore, insufficient to show a reasonable probability that the result of his trial would have been different had she testified. Furthermore, as the state court noted, Petitioner fired defense counsel two days prior to trial; therefore, it was his obligation, not former counsel's, to secure witnesses for trial. Therefore, Petitioner has failed to demonstrate that the state court's adjudication of the claim was based upon an unreasonable determination of the facts or contrary to or an unreasonable application of <u>Strickland</u>.

> F.    <u>Ground Six: "Ineffective assistance of counsel for violating his duty of loyalty to his client the Petitioner."</u>

Petitioner states Attorney Robert Morris, whose law firm was appointed to represent Petitioner after trial, violated his duty of loyalty to Petitioner by advising the victim, who Petitioner

alleges went to Attorney Morris' office to give a "recanted statement" prior to sentencing, that she may subject herself to certain consequences, such as imprisonment, if she recanted her testimony (Doc. 4 at 10–11). Petitioner states that as a result of Attorney Morris's alleged advice, his daughter became "duressed" [sic] and would not provide a recantation (*id.* at 11). Petitioner contends Attorney Morris's conduct caused him to lose his opportunity to present his daughter's recantation as newly discovered evidence in support of a motion for new trial (*id.*).

Respondent concedes that Petitioner exhausted this claim by presenting it as Ground Four in his Rule 3.850 motion (Doc. 25 at 24). Respondent contends Petitioner has failed to show that the state court's adjudication of the claim was based upon an unreasonable determination of the facts or contrary to or an unreasonable application of Strickland (*id.* at 24–25). Respondent argues it was no secret that Petitioner's daughter was a reluctant witness, since she had provided a pretrial affidavit withdrawing her accusations against Petitioner and asking the court to dismiss the charges; however, neither the affidavit nor the letter to Petitioner from his daughter, which Petitioner submitted as an exhibit to his Rule 3.850 motion, constituted a recantation of her allegations (*id.* at 24). Respondent additionally asserts that even if the victim recanted to Attorney Morris, his reaction was reasonable under the circumstances (*id.*). Further, any such recantation would have been viewed in light of the other evidence and likely would have made no difference in Petitioner's sentence (*id.*).

1.      Clearly Established Federal Law

The clearly established Supreme Court law governing claims of ineffective assistance of counsel is the two pronged Strickland standard described *supra*.

2       Federal Review of State Court Decision

Petitioner raised this ineffective assistance of counsel claim as Ground Four in his Rule 3.850 motion (Ex. Q at 96–98, 127–28). The state court denied the claim, and the First DCA affirmed. In the trial court's written decision, the court found as fact that Petitioner argued in his pre-trial motions, at trial, and in his post-conviction motion, that the victim tried to recant her story but was prohibited from doing so (*id.* at 241). The court found that exhibits submitted by Petitioner himself refuted the assertion that the victim attempted to recant her allegations (*id.*). The court found that the victim's written attempt to withdraw the charges against Petitioner did not state that the

allegations she made were fabricated, but only that she did not want to testify against her father (*id.* at 241–42). The court further found that the victim's letter to Petitioner after trial and before sentencing included a "rambling apology" and an expression of sympathy for Petitioner's situation but in no way indicated that her initial allegations, deposition testimony, or trial testimony were false (*id.*). The state court concluded that counsel could not be deemed ineffective for failing to present argument that had no basis in fact (*id.* at 242).

The undersigned will first determine whether Petitioner has shown, by clear and convincing evidence, that the state court's findings of fact are unreasonable. In Petitioner's reply brief, he argues that the state court could not have found that the letter was a rambling apology or expression of sympathy without holding an evidentiary hearing (Doc. 30 at 17). He appears to concede that his daughter did not actually recant her allegations in her pre-trial affidavit or her post-trial letter, but he argues this shows the significance of Attorney Morris's failure to record her alleged post-trial recantation (*id.* at 16). Petitioner contends Respondent's assertion that a recantation would not have affected Petitioner's sentence is purely speculative, since it is unknown what information the victim would have provided if Attorney Morris had recorded her statement (*id.* at 17–18).

Upon review of Petitioner's submissions and the state court record, the court concludes that Petitioner has failed to demonstrate that the state court's factual findings are unreasonable or that its denial of his claim was an unreasonable application of <u>Strickland</u>. Initially, Petitioner failed to present, either in the state court or in this federal proceeding, any evidence supporting his assertions as to the content of any discussion that occurred between his daughter and Attorney Morris. Furthermore, Petitioner's submissions do not support his assertion that his daughter went to Attorney Morris's office with the intention of recanting her allegations of sexual abuse.[15] Although Petitioner submitted the victim's pre-trial affidavit and her post-trial letter to him as evidence that she intended

---

[15] Petitioner asserted in his Rule 3.850 motion that his daughter and his brother visited Mr. Morris with the intention of advising Morris that his daughter fabricated the allegations against Petitioner and wanted to set the record straight (Ex. Q at 71). Petitioner stated his daughter was afraid because she and her mother had been threatened, and she did not know what to do (*id.*). Petitioner states his daughter had been recently released from a juvenile detention center, when she was detained for stabbing a classmate at school (*id.* at 71–72). He further states his daughter went to Attorney Morris because she thought he could help her with the situation, but instead of taking her statement, Morris advised her that if she went through with her intended actions, she could be sentenced to 15 years in prison for perjury (*id.* at 72). Petitioner stated that as a result of Attorney Morris's statement, his daughter was afraid but told Morris she did not want her father to go to prison (*id.*). These assertions are based upon hearsay. Petitioner did not provide any evidentiary support for his assertions.

to recant her allegations, neither of these documents includes a recantation of any facts to which she testified at trial (*see* Ex. Q at 139, 151–53). Her affidavit states she wishes to withdraw all accusations made against her father; she does not want to testify against her father or be forced to do so; and she requests that the court dismiss all charges and release him from jail (*id.* at 139). Her post-trial letter, dated March 26, 2004 (eight days after trial and one month prior to sentencing), states she still loves Petitioner; she sympathizes with him; she does not know how she is going to overcome the situation; if she could change everything that happened, she would; and she hopes he finds "so[me] kind of happiness" from her letter (*id.* at 151–53). In the absence of any factual support for his assertion that the victim intended to recant her testimony and that Attorney Morris discouraged or otherwise prevented her from doing so, Petitioner failed to demonstrate that counsel performed deficiently. Therefore, he has failed to establish that the state court's denial of his claim was based upon an unreasonable determination of the facts or was an unreasonable application of Strickland.

G.     Ground Seven: "Ineffective assistance of counsel during sentencing."

Petitioner states Attorney Morris failed to inform him that he had requested a pre-sentence investigation report ("PSI") and that Petitioner's former probation officer would be interviewing Petitioner in preparation of the report (Doc. 4 at 11–12). Petitioner states as a result of counsel's error, Petitioner refused to speak with the probation officer at the jail and told the officer to speak with Attorney Morris (*id.* at 12). He states he was thus unable to provide mitigating evidence to the probation officer; and the probation officer recommended a harsher sentence because he was offended by Petitioner's conduct (*id.*).

Respondent concedes Petitioner exhausted this claim by presenting it as Ground Four in his Rule 3.850 motion (Doc. 25 at 26). Respondent contends Petitioner has failed to show that the state court's adjudication of the claim was based upon an unreasonable determination of the facts or contrary to or an unreasonable application of Strickland (*id.* at 26–27). Respondent argues that Petitioner's assertion that the probation officer recommended a harsher sentence due to Petitioner's refusal to speak with him is pure speculation (*id.* at 26). Additionally, Petitioner failed to identify any specific information that he would have provided to the officer; and he failed to explain why he could not have provided such information himself to the sentencing court (*id.*). Therefore, Petitioner

failed to demonstrate that the state court's denial of his claim was contrary to or an unreasonable application of <u>Strickland</u>.

      1.      Clearly Established Federal Law

The clearly established Supreme Court law governing claims of ineffective assistance of counsel is the two pronged <u>Strickland</u> standard described *supra*.

      2      Federal Review of State Court Decision

Petitioner raised this ineffective assistance of counsel claim as Ground Four in his Rule 3.850 motion (Ex. Q at 98–99, 128). The state court denied the claim, and the First DCA affirmed. In the trial court's written decision, the court determined that Petitioner was not entitled to a PSI under state law, but counsel obtained one in an effort to understand Petitioner's background and the happenings at trial (*id.* at 241). The court found that Attorney Morris adequately argued the mitigating factors available to Petitioner (including that Petitioner maintained his innocence) and requested that Petitioner receive the lowest available sentence (*id.*). The court additionally found that prior to imposition of sentence, Petitioner was provided an opportunity to consult privately with counsel or address the court concerning any issues he wished to bring to the court's attention, but Petitioner declined, stating, "I prefer to go ahead with it." (*id.*).

Initially, Petitioner's assertion that the probation officer recommended a harsher sentence because he was offended by Petitioner's refusal to speak with him is purely speculative. Petitioner offers absolutely no factual support for this assertion. Furthermore, Petitioner has failed to show he was prejudiced by his inability to provide mitigating evidence to the probation officer. The transcript of the sentencing hearing confirms the state court's findings that Attorney Morris argued that Petitioner was "adamant" with respect to his innocence, and Morris requested that the lowest permissible sentence be imposed (*id.* at 4). Additionally, Attorney Morris stated on the record that he met with Petitioner at the jail prior to sentencing (*id.* at 3–4), thus providing Petitioner an opportunity to provide to Morris any mitigating information he wished to be presented to the court. The sentencing transcript also confirms that Attorney Morris and the sentencing judge asked Petitioner if there was anything he wished to say or any facts he wished to bring to the court's attention prior to imposition of sentence, and Petitioner responded, "I prefer to go ahead with it." (*id.* at 5–6). Petitioner has thus failed to demonstrate a reasonable probability that the outcome of

his sentencing hearing would have been different if counsel had informed him that he had requested a PSI, and a probation officer would be interviewing Petitioner in preparation of the report. Accordingly, Petitioner is not entitled to federal habeas relief on this claim.

H.    Ground Eight: "Ineffective Assistance of Appellate Counsel for Failing to Raise the "Faretta" Issue in Petitioner's Direct Appeal."

In Ground Eight of the instant petition, Petitioner contends he received ineffective assistance of appellate counsel based upon counsel's failure to raise the Faretta issue (that is, whether the trial court violated his constitutional right to counsel by failing to conduct a sufficient inquiry as to whether Petitioner knowingly and voluntarily waived his right to counsel) on direct appeal (Doc. 4 at 12–13).

Respondent concedes that Petitioner exhausted this claim by presenting it in his state habeas petition (Doc. 25 at 28).  Respondent contends Petitioner failed to demonstrate that the First DCA's denial of the claim was contrary to or an unreasonable application of clearly established federal law (id. at 28–29).

1.    Clearly Established Federal Law

The proper standard for evaluating a claim of ineffective assistance of appellate counsel is the two-pronged Strickland standard.  Petitioner must show that his counsel was objectively unreasonable in failing to raise a particular claim.  See Smith v. Robbins, 528 U.S. 259, 285,120 S. Ct. 746, 764, 145 L. Ed. 2d 746 (2000) (citation omitted).  To be effective, appellate counsel need not argue every non-frivolous ground for appeal, but may "select among them in order to maximize the likelihood of success on appeal." Id., 528 U.S. at 288.  Furthermore, the practice of "winnowing out" weaker arguments on appeal, so to focus on those that are more likely to prevail, is the "hallmark of effective appellate advocacy." Smith v. Murray, 477 U.S. 527, 536, 106 S. Ct. 2661, 2667, 91 L. Ed. 2d 434, 445 (1986); see also  Jones v. Barnes, 463 U.S. 745, 753–54, 103 S. Ct. 3308, 3314, 77 L. Ed. 2d 987 (1983) ("Experienced advocates since time beyond memory have emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most on a few key issues.").  If Petitioner succeeds in showing that counsel's failure to raise a particular issue was unreasonable, he then has the burden of demonstrating prejudice.  That is, he must show a reasonable probability that, but for appellate

counsel's unreasonable failure to raise the particular claim, he would have prevailed on his appeal. *See* Smith v. Robins, 528 U.S. at 265.

        2.        Federal Review of State Court Decision

In Ground I of Petitioner's state habeas petition, he claimed that his appellate counsel performed ineffectively by failing to include the Faretta issue in the direct appeal of his conviction (Ex. U at 6–18). The First DCA denied the petition on the merits (Ex. X).

In light of the undersigned's conclusion in Ground One, *supra*, that Petitioner's Faretta claim was without merit, Petitioner has failed to demonstrate that appellate counsel's failure to present this issue on appeal was objectively unreasonable, or that there was a reasonable probability of success on appeal had counsel presented it. Therefore, Petitioner is not entitled to federal relief on his claim.

        I.        Ground Nine: "Ineffective assistance of appellate counsel due to conflict of interest."

Petitioner states he filed a complaint with The Florida Bar against Attorney Robert Morris, a partner with the law firm of Banks and Morris, alleging that Attorney Morris mishandled his case during sentencing (Doc. 4 at 13). Petitioner states Attorney James Banks, also a partner with the firm, thus labored under an actual conflict of interest when he represented Petitioner on direct appeal (*id.*). Petitioner further asserts that had it not been for the Florida Bar complaint against Attorney Morris, Attorney Banks would have raised the Faretta issue on direct appeal (*id.*).

Respondent concedes that Petitioner exhausted this claim by presenting it in his state habeas petition (Doc. 25 at 29). Respondent contends Petitioner failed to demonstrate that the First DCA's denial of the claim was contrary to or an unreasonable application of clearly established federal law (*id.* at 29–30).

        1.        Clearly Established Federal Law

The clearly established federal standard for evaluating a claim of ineffective assistance of appellate counsel is set forth *supra*. However, there is a limited presumption of prejudice where counsel has an actual conflict of interest. Strickland, 466 U.S. at 691 (citing Cuyler v. Sullivan, 446 U.S. 335, 100 S. Ct. 1708, 64 L. Ed. 2d 333 (1980)). This presumption, which requires automatic reversal, applies only where an attorney is forced to represent co-defendants over his own objection, unless the court has found no conflict. Mickens v. Taylor, 535 U.S. 162, 167–68, 122 S. Ct. 1237, 1241–42, 152 L. Ed. 2d 291 (2002) (discussing Holloway v. Arkansas, 435 U.S. 475, 98 S. Ct. 1173,

55 L. Ed. 2d 426 (1978)).  The <u>Mickens</u> Court noted that while the Courts of Appeals had "unblinkingly" applied <u>Sullivan</u> to all kinds of purported ethical conflicts:  "[T]he language of <u>Sullivan</u> itself does not clearly establish, or indeed even support, such expansive application.  '[U]ntil,' it said, 'a defendant shows that his counsel *actively represented* conflicting interests, he has not established the constitutional predicate for his claim of ineffective assistance.'" <u>Mickens</u>, 535 U.S. at 175 (quoting <u>Sullivan</u> with added emphasis, other citations omitted).  Thus, the Eleventh Circuit held that Supreme Court precedent does <u>not</u> clearly establish that the <u>Sullivan</u> rule of presumed prejudice applies in other conflict situations, that is, outside concurrent, multiple representation circumstances.  *See* <u>Schwab v. Crosby</u>, 451 F.3d 1308, 1324–25, 1327–28 (11th Cir. 2006).  In conflict situations where prejudice is not presumed, a petitioner must demonstrate that an adverse effect on counsel's performance flowed from the conflict of interest.  *See* <u>Hunter v. Sec'y Dep't of Corr.</u>, 395 F.3d 1196, 1201–02 (11th Cir. 2005); <u>Herring v. Sec'y, Dep't of Corr.</u>, 397 F.3d 1338, 1357–58 (11th Cir. 2005).

> 2.      Federal Review of State Court Decision

Petitioner raised this issue as Ground II in his state habeas petition (Ex. U at 19–22).  The First DCA denied the petition on the merits (Ex. X).

It is important to note that Petitioner does not assert that Attorney Banks's alleged conflict of interest arose from concurrent, multiple legal representation.  Therefore, to the extent the First DCA's denial of Petitioner's claim was based upon application of the legal principle that prejudice to the outcome cannot be presumed outside of a case of multiple concurrent representation, that conclusion cannot be said to have been contrary to federal law as established by the Supreme Court.  *See* <u>Schwab</u>, 451 F.3d at 1327.  Furthermore, Petitioner has failed to demonstrate that the First DCA confronted a set of facts that were materially indistinguishable from a decision of the Supreme Court and nevertheless arrived at a different result.  Therefore, he is entitled to federal habeas relief only if he demonstrates that the First DCA's adjudication of the claim was an unreasonable application of Supreme Court precedent.

Petitioner argues he was prejudiced by Attorney Banks's alleged conflict because Banks failed to raise the <u>Faretta</u> issue on appeal.  However, as discussed in Ground One, *supra*, the <u>Faretta</u> issue was not meritorious; therefore, Petitioner failed to show an adverse effect of the alleged

conflict (that is, that Attorney Banks failed to pursue a reasonable alternative strategy because it conflicted with his loyalty to Attorney Morris). Consequently, Petitioner has not shown that the state court's adjudication of the merits of his federal claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).

J.  Ground Ten:  "Ineffective assistance of appellate counsel due to erroneous transcript."

Petitioner states the record on appeal was incomplete and "not verbatim" in that it did not reflect "what was actually said during the Faretta issue" and other "critical proceedings" (Doc. 4 at 14). He states Attorney Banks, his appellate counsel, would have learned of the errors in the record if Banks had consulted with him and responded to his letters (*id.*). Petitioner states he did not discover the alleged errors in the record until Attorney Banks forwarded him the record on appeal upon conclusion of the appeal (*id.*). He states he wrote a letter to the clerk of court requesting an investigation, but the court did not respond (*id.* at 14–15).

Respondent concedes that Petitioner exhausted this claim by presenting it in his state habeas petition (Doc. 25 at 30). Respondent contends Petitioner failed to demonstrate that the First DCA's denial of the claim was contrary to or an unreasonable application of clearly established federal law (*id.* at 30–31).

1.  Clearly Established Federal Law

The clearly established federal standard for evaluating a claim of ineffective assistance of appellate counsel is set forth *supra*.

2.  Federal Review of State Court Decision

Petitioner raised this issue as Ground III in his state habeas petition (Ex. U at 22–26). He supported his claim with an exhibit comprised of his allegations of significant alterations of the transcripts of seven hearings in the trial court, including pre-trial hearings, the trial itself, and the sentencing hearing (*see id.*; Doc. 37, Ex. Z (Petitioner's Exhibit M to his state habeas petition)). In its response to the state habeas petition, the State noted that in Florida, the appellate record is presumed correct, and an allegation that transcripts are inaccurate, even when supported by affidavits, is not enough to rebut this presumption (Ex. V at 15). The State also argued that

Petitioner offered nothing more than his own self-serving statements to support his allegations; and the scope of the alleged inaccuracies was so broad that it militated against the credibility of Petitioner's allegations (*id.*). The First DCA denied the petition on the merits (Ex. X).

Petitioner's allegations of inaccuracies in the transcripts were insufficient to rebut the court reporters' certifications that the transcripts were true and correct records of the proceedings (Ex. B at 43, Ex. D at 32, Ex. E at 9, Ex. F at 9, Ex. H at 281, Ex. I at 11) and thus did not provide a reasonable basis for appellate counsel to investigate the accuracy of the transcripts or seek correction of the record based upon the inaccuracies alleged by Petitioner. Indeed, many of Petitioner's purported "corrections" are statements that certain portions of transcripts "appear to be altered," statements that certain portions of the record were altered without specifying the nature of the alleged alteration, statements that he does not recall that certain statements included in the transcripts were made, and statements providing commentary on the proceedings (*see* Doc. 37, Ex. Z). Therefore, Petitioner failed to demonstrate that appellate counsel's failure to investigate the accuracy of the transcripts and seek correction of Petitioner's alleged inaccuracies was unreasonable, or that there is a reasonable probability that the outcome of his appeal would have been different if counsel had done so. Petitioner's having failed to satisfy either prong of the <u>Strickland</u> standard, the First DCA's denial of his claim was not contrary to or an unreasonable application of clearly established federal law.

## V.    CERTIFICATE OF APPEALABILITY

As amended effective December 1, 2009, § 2254 Rule 11(a) provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant," and if a certificate is issued "the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2)." A timely notice of appeal must still be filed, even if the court issues a certificate of appealability. Rule 11(b), Rules Governing Section 2254 Cases.

The undersigned finds no substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2); <u>Slack v. McDaniel</u>, 529 U.S. 473, 483–84, 120 S. Ct. 1595, 1603–04, 146 L. Ed. 2d 542 (2000) (explaining how to satisfy this showing) (citation omitted). Therefore, the undersigned recommends that the district court deny a certificate of appealability in its final order.

The second sentence of new Rule 11(a) provides: "Before entering the final order, the court may direct the parties to submit arguments on whether a certificate should issue." Thus, if there is an objection to this recommendation by either party, that party may bring this argument to the attention of the district judge in the objections permitted to this report and recommendation.

Accordingly, it is respectfully **RECOMMENDED**:

1. That the amended petition for writ of habeas corpus (Doc. 4) be **DENIED**.

2. That a certificate of appealability be **DENIED**.

At Pensacola, Florida, this 6th day of October 2010.


/s/ *Elizabeth M. Timothy*
**ELIZABETH M. TIMOTHY**
**UNITED STATES MAGISTRATE JUDGE**

## NOTICE TO THE PARTIES

**Objections to these proposed findings and recommendations may be filed within fourteen (14) days after being served a copy thereof.  <u>Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.</u>  A copy of objections shall be served upon the magistrate judge and all other parties.  Failure to object may limit the scope of appellate review of factual findings.  *See* 28 U.S.C. § 636; <u>United States v. Roberts</u>, 858 F.2d 698, 701 (11th Cir. 1988).**